## L. & N. R. R. Co. v. Allen

(Decided February 11, 1913.)

'Appeal from Allen Circuit Court.

1. Carriers—Control and Regulation of Common Carriers—Preference and Discrimination.—Under the Interstate Commerce Act, section 214 of the Constitution, and section 817, Ky. Stats., contracts between carrier and shipper, for a preferential rate, are inoperative and void.

2. Carriers—Control and Regulation of Common Carriers—Interstate Transportation.—A shipment of goods from one point to another in this State, over the line of a carrier leaving and returning to the State, between such points, is an interstate shipment.

3. Carriers—Schedule of Rates—Establishment and Validity of.—The tariff of charges for interstate transportation of goods is established by the filing, by the carrier, with the Interstate Commerce Commission, of a schedule of rates. The validity of such rates is not affected by the failure of the freight officers or agents, of the carrier, to receive or post, in its depots, copies of the schedule of rates adopted.

4. Carriers—Carriage of Goods—Discrimination—Action for Excess over Undercharge—Defenses—Estoppel.—Where the proof shows that the charges on shipments, paid to the carrier by the shipper, are less than the adopted schedule of rates therefor, at time of shipment, judgment should be for the carrier for the difference. In an action for such difference, neither the ignorance of the shipper that he was receiving a preferential rate, nor the fact that, by reason of having received a preferential rate, he was induced to and did enter into disadvantageous contracts, nor the laches of the carrier in asserting its claim, constitutes a valid defense.

GOAD & OLIVER, W. G. DEARING, CHAS. H. MOORMAN and BENJAMIN D. WARFIELD, for appellant.

BRADBURN & BASHAM, for appellee.

OPINION OF THE COURT BY JUDGE LASSING.—Reversing.

The Louisville & Nashville Railroad Company filed suit in the Allen Circuit Court against J. W. Allen, in which it sought to recover of him $732.00, alleged to be due it, on account of undercharges made by it to him in the shipment of freight over its lines between Wildwood, Petroleum and Adolphus in Kentucky, and other points along its line in the State of Tennessee, and Scottsville, Ky. The defendant answered, denying that he was indebted to the company in any sum whatever; pleaded that, prior to the date of the shipments, upon which it

is alleged there was an undercharge, the company had posted in its depots along its line a schedule of tariff rates; and that the shipments were made by him in accordance with the provisions of this tariff schedule, that is, at the rates therein provided; that now to permit the company to charge him a rate in excess of that agreed upon would cause him to suffer great loss; that, if there was an undercharge, which he denied, the plaintiff knew all along that this undercharge was made and suffered and permitted it to continue; and that it should not now be heard to complain, or enabled to recover it back at his expense. The affirmative matter of the answer was traversed in the reply. Proof was taken, the case submitted, and the chancellor, upon consideration, held that plaintiff was not entitled to the relief sought and dismissed the petition. The railroad company appeals.

At the outset, the question is raised as to whether or not the shipments, for which these charges were made, were interstate shipments. Scottsville is in Kentucky; Wildwood, Petroleum and Adolphus, points from which a part of this freight was shipped, are also in Kentucky, but it is alleged that the line of railroad, after passing these stations, runs for some distance in the State of Tennessee, and thence back into Kentucky to Scottsville; and it is insisted that this fact makes it an interstate shipment as to all freight shipped in this manner from one point to another point in this state. This position is well taken, as was expressly decided in Hanley v. K. S. S. Ry. Co., 187 U. S., 617, where, when goods had been shipped from one point to another point in the same state, the road between these two points running through another state, the court held: "The transporation of these goods certainly went outside of Arkansas, and we are of the opinion that, in its aspect as commerce, it was not confined within the state.    *    *    *    To bring the transportation within the control of the state, as part of its domestic commerce, the subject transported must be during the entire voyage under the exclusive jurisdiction of the state.'

This principle was recognized and approved in Railroad Warehouse Commission v. C. St. P. M. & O. R. Co., 40 Minn., 267; Sternberger v. Cape Fear & Y. Valley R. Co., 29 S. C., 510; and Milk Producers Pro. Ass'n. v. D. L. & W. R. Co., 7 I. C. C. R., 92.

The point next raised is, that the tariff governing

these shipments was never published, as the law provides. So much of section 6 of the Interstate Commerce Act as bears upon this point reads as follows:

"That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection schedules showing all the rates, fares and charges for transportation between different points on its own route and between on its own route and points on the route of any other carrier by railroad, by pipe line, or by water, when a through route and joint rate have been established."

The evidence unquestionably shows that the Railroad company did seasonably make out and file with the Interstate Commerce Commission the schedules provided for by this section of the act, and that copies thereof were forwarded to all of the agents along its line or road; but the proof further shows that the agents at some of the stations, from which these shipments were made, either did not receive the schedules or failed to post them after they were received. The rates fixed in these schedules are undoubtedly higher than the rates paid by appellee; and the evidence satisfactorily shows that the difference between the prices actually paid on these shipments and the tariff charges, amounts to the claim sued on; and, unless the failure of the company to post copies of this schedule, in the depots in question, invalidates same and renders it inoperative and unenforcible, or the company, by reason of its laches in asserting its claim, is estopped from enforcing the payment of the undercharge, the judgment should have been in favor of the company.

The law provides a heavy penalty, a fine of not less than $1,000 nor more than $20,000, upon both shipper and carrier, for a failure to observe the published tariff rates as shown by the schedule. The purpose of the Interstate Commerce Act, in requiring copies of the schedule of rates to be kept on file in all depots and open to the inspection of the public, is to advise shippers of the rates which the companies are authorized to charge; and a prospective shipper would naturally go to the depot to consult the agent relative to his shipment, the provision of the law to the effect that these schedules should be posted in two public and conspicuous places in every depot, station or office of such carrier where freight is received for transportation, was calculated to bring such tariff schedule directly under the notice of the shipper,

where he would have every opportunity to advise himself fully as to the rates. It is insisted for the company, that the mailing of copies of this schedule to the agents, when coupled and considered with their testimony in the case, justifies the conclusion that the notices were posted. But, to this line of argument, we cannot subscribe. The weight of the evidence is to the effect that, while copies of the schedule were mailed, they were not, in fact, posted in some of these depots. But, is the published schedule, or tariff of rates that may be charged, to be invalidated simply because some local depot agent fails to discharge his duty? We think not. The purpose of the law, in requiring these schedules to be established by filing with the Interstate Commerce Commission and the distribution of copies where they could be readily seen by the shipping public, was to prevent railroads from showing favoritism in the shipment of freight; and, if it could be avoided by the negligence of an agent, in charge of some out of the way or obscure depot, the whole purpose of the law would fail. If the tariff depended for its validity, upon the posting of the schedules in each depot, it can readily be seen that the validity of the entire schedule would be made to depend, not upon whether the schedule of charges had, in fact, been adopted, but upon whether or not some employe in charge of some out of the way point along the line of the carrier's road, had properly discharged his duty. No construction, which would defeat the purpose of the act, should be adopted. Courts, in which this question has been raised, have uniformly held that the validity of the schedule of tariff rates does not depend upon the posting of copies thereof in the depots along the line of the road to be affected thereby, but that such rates are established by the making out and filing of the schedule with the Interstate Commerce Commission, and that the posting of the copies is but evidence of the fact that such tariff rates have been adopted. The legality of the rate fixed by the schedule was called in question in the case of Texas & Pacific Ry. Co. v. Cisco Oil Mill, 204 U. S., 449. It was contended that the rate, as fixed in the schedule, was not lawful because a copy had not been posted in two public and conspicuous places in every depot, waiting room, office, etc., as the law required. In disposing of this question, the court said:

"The assumption (that 'no schedule rate was in exis-

tence'), it is insisted, is authorized because it is asserted, the conclusion that the schedule of rates became legally operative was not justified by the finding that such schedule had been filed with the Interstate Commerce Commission and copies thereof furnished to the freight officers of the railroad company at Cisco and other points. The contention is without merit. The filing of the schedule with the Commission and the furnishing by the railroad company of copies to its freight office incontrovertibly evidenced that the tariff of rates contained in the schedule had been established and put in force as mentioned in the first sentence of the section, and the railroad company could not have been heard to assert to the contrary. The requirement that schedules should be 'posted in two public and conspicuous places in every depot,' etc., was not made a condition precedent to the establishment and putting in force of the tariff of rates, but was a provision based upon the existence of an established rate, and plainly had for its object the affording of special facilities to the public for ascertaining the rates actually in force. To hold that the clause had the far-reaching effect claimed, would be to say that it was the intention of Congress that the negligent posting by an employe of but one instead of two copies of the schedule, or the neglect to post either, would operate to cancel previously established schedule— a conclusion impossible of acceptance. While section 6 forbade an increase or reduction of rates, etc., 'which have been established and published as aforesaid,' otherwise than as provided in the section, we think the publication referred to was that which caused the rates to become operative; and this deduction is fortified by the terms of section 10 of the Act making it a criminal offense for a common carrier or its agent or a shipper or his employe improperly 'to obtain transportation at less than the regular rates then established and in force on the line of transportation of such common carrier.' "

In harmony with this decision is the opinion of the court in Kansas City So. Ry. Co. v. Albers Comm. Co., 223 U. S., 594. In the comparatively recent case of Illinois Central R. R. Co. v. Henderson Elevator Co., 138 Ky., 220, this court said:

"It is well established by the opinions of the United States Supreme Court that when a common carrier makes its schedule of rates and files them with the Interstate

Commerce Commission, and that body approves and pro-
mulgates them as the act requires, the parties, the carrier
and shipper must oberve them, and any known departure
therefrom will subject them to a fine of not less than
$1,000, nor more than $20,000 for each offense.''

Hence, while it was the duty of the railroad company
to post in two conspicuous places, in each of its depots,
copies of the tariff of rates filed in its schedule with the
Interstate Commerce Commission, its failure to do so did
not have the effect of invalidating the rates that were es-
tablished, for such copies, as well said in the Cisco Oil
case *supra*, are but evidence of the fact to the public that
such rates have already been established. Hence the fact,
if such it was, that the company failed in this case to post
copies of the tariff as the law required, affords appellee
no relief.

The only remaining question is that raised by appellee
in the last paragraph of his answer, which is, in effect, a
plea in estoppel. It is conceded that the agent represent-
ing the company, entered into an agreement with appellee,
whereby he agreed that the charges on the total
amount of freight shipped should be $732.00 less
than, by the tariff rates as set out in the sched-
ule, it should have been. The company alleges
that it did not discover for some time that the
rates being charged were less than the tariff of rates;
that, when the discovery was made, it realized that it was
rendering itself subject to a penalty for undercharging;
and that it was its imperative duty to collect these under-
charges. The law imposes upon the shipper a penalty for
shipping goods at a rate less than the schedule tariff of
rates; and hence, inasmuch as the law requires the rail-
road company to charge a fixed rate and the shipper to
pay the same fixed rate, it is immaterial that a mis-
take was made, and the shipper cannot shelter himself
behind the allegations that it was a special contract ar-
rangement, by which the shipment was made, any more
than the railroad company could avoid returning to him
his money upon demand, if it should have been discov-
ered that the railroad company had, in fact, charged him
more instead of less than the schedule rate. Had the
company charged more, upon demand it would have been
required to pay back. The shipper having paid less, is
likewise required to pay back. It was to prevent the rail-
road company from showing favoritism, whereby one

shipper was given an advantage over another, that this
law was enacted. It was to prevent the making of special
contracts for shipments, and to put all shippers on an
equality. This identical question was before this court
and decided adversely to the contention of counsel for ap-
pellee in the case of C. & O. Ry. Co. v. Maysville Brick Co.,
132 Ky., 643. There the Maysville Brick Company en-
tered into a contract with the agent of the railroad com-
pany at Maysville for the shipment of a certain number
of carloads of brick to Frankfort, Ky., at four cents per
hundred pounds. Under this special arrangement, 48 car-
loads of brick were shipped. Upon the delivery of the
cars at Frankfort, a rate of seven cents per hundred, in-
stead of four, was charged and collected from the con-
signees. Thereafter the Maysville Brick Company in-
stituted suit against the railroad company to recover the
difference between four cents, their contract price, and
seven cents, the amount actually charged, which was the
schedule rate. The defendant answered and pleaded that
the seven cents per hundred was the regular schedule tar-
iff rate; and that its local agent at Maysville, in ignorance
of what the tariff rate was, made the special contract,
but that, inasmuch as the same was in direct violation of
section 214 of the Constitution, and section 817 Kentucky
Statutes, denying to common carriers the right to make
preferential rates, it was inoperative and void. A demur-
rer was sustained to this answer. The defendant de-
clined to plead further, and judgment was given for the
amount of the difference between the contract price of
four cents per hundred and the tariff charge of seven cents
per hundred. Upon appeal, this court held that the par-
ties were bound by the tariff rate, although the special
rate was made in ignorance of the fact that a preferen-
tial rate was being made to the shipper. It was argued
with much earnestness and with great plausibility in that
case, that the shipper had been induced to enter into a
contract for the sale of its brick at a stipulated price,
under the belief that the cost of freight charges would
be but four cents per hundred, and that it would suffer
a severe loss if it should be held that it must pay the tar-
iff rate as fixed in the schedule. The court held, in an
elaborate opinion there, that it would be against a sound
public policy to permit the plaintiff to profit by a pref-
erential rate, although, at the time the hipment was
made, it was in entire ignorance of the fact that it was

receiving a preference. The reasoning for the rule announced in that case applies with equal force to the case at bar.

Upon the state of the record, the judgment should have been for the plaintiff, and it is, therefore, reversed and remanded with directions for further proceedings in conformity with this opinion.