### Blackford v. St. Louis, Iron Mountain & Southern Railway Company and Louisville & Nashville Railroad Company.

(Decided June 11, 1918.)

Appeal from Jefferson Circuit Court (Common Pleas, Second Division).

1. **Carriers—Rates of Freight—Shippers.**—When a schedule of freight rates is filed with the Interstate Commerce Commission by an interstate carrier, pursuant to the provisions of section 6 of the Interstate Commerce Act, such rate is binding upon both the shipper and the carrier, and no less rate may be charged although by mistake or otherwise such less rate should be agreed to, and it is the duty of the carrier to collect and of the shipper to pay the difference between the quoted rate and that filed with the commission.

2.  Carriers—Rates of Freight—Lien.—A common carrier has a lien upon the shipment for the payment of the freight, and where by erroneous quotation or otherwise a less rate than the legal one is quoted, the carrier has the right to retain custody of the shipment at the point of destination until the balance of the legal rate is paid, and if damages result from the delay in unloading the shipment because of a failure of the shipper to pay such balance, the carrier is not responsible to the shipper in damages therefor.

3.  Carriers—Rates of Freight.—The duty of the carrier to collect and of the shipper to pay the rate fixed in the schedule filed with the Interstate Commerce Commission is not affected because of the fact that such rate is not posted in the stations of the common carrier, since shippers are presumed to take notice of the rate filed with the commission.

THOMAS C. MAPOTHER for appellant.

HELM & HELM, BENJAMIN D. WARFIELD and EDWARD J. WHITE for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and plaintiff below, G. L. Blackford, on April 11, 1916, shipped from Hot Springs, Arkansas, to Louisville, Kentucky, seven race horses, among which was one named "Bookie." The appellee, St. Louis, Iron Mountain & Southern Railway Company, was the initial carrier, while the delivering one was the appellee, Louisville & Nashville Railroad Company; which took possession of the shipment at Memphis, Tennessee. In the early afternoon of April 13 the shipment, which was made in an Arms palace car, of the largest and best equipped size and especially designed for the shipment of horses, arrived in the city of Louisville. The rate which was quoted by the agent at Hot Springs to plaintiff for the shipment, and which was paid by him, was $176.10, but it was afterward discovered that this sum lacked $85.80 of being the rate for that character of shipments between the two points mentioned, which rate was on file with the Interstate Commerce Commission and in effect on the date of the shipment. Upon the arrival of the stock in Louisville the Louisville & Nashville Railroad Company declined to permit the horses to be unloaded until the balance of the freight, $85.80, was paid. This was not done until the next morning, when the stock was unloaded at Douglas Park, in that city, and two days thereafter, on April 16, the horse "Bookie" developed a case of

pneumonia, from which he died on April 24, and to re-
cover for his value, which is alleged to be $2,000.00, and
for medicine and bill of the veterinary surgeon, amount-
ing to $52.00, plaintiff filed this suit against the two
corporations, alleging that the detention of the horses
in the car from the afternoon of April 13 until the morn-
ing of April 14 was the cause of "Bookie" contracting
and developing pneumonia, and that the agent of the
initial carrier had wrongfully quoted the freight on the
shipment, which if he had done correctly it would have
been paid and there would have been no delay in unload-
ing it at its destination.

It is also alleged that because of the long haul the
horses became "droopy" and Bookie was especially in
that condition when the shipment arrived at Louisvlle,
and "Plaintiff states that said shipment was not un-
loaded and cared for and not delivered by the defendant,
Louisville & Nashville Railroad Company, and that it
did not allow this plaintiff to unload and care for said
stock until the morning of April 14, 1916, and some
nineteen hours after the arrival at South Louisville, Ken-
tucky, as aforesaid, being allowed by said defendant to
remain confined in the car in which it arrived at South
Louisville during this interim."

Demurrers filed by each defendant were overruled,
and in separate answers they denied the allegations of
the petition and pleaded contributory negligence; in a
third paragraph they relied upon the fact that the rate
for this character of shipments had been filed with the
Interstate Commerce Commission and that the total
amount of it was, according to the schedule so filed, the
sum of $261.90, instead of $176.10, the amount paid by
plaintiff at the beginning of the shipment. A reply com-
pleted the issues, and upon a trial of the case the court
gave to the jury a peremptory instruction to find for the
defendants, which was done, and the petition was dis-
missed. To reverse that judgment this appeal is prose-
cuted.

A part of section 6 of the Interstate Commerce Act
is: "That every common carrier subject to the provis-
ions of this act shall file with the commission created
by this act, and print and keep open to public inspection
schedules showing all the rates, fares and charges for
transportation between different points on the route of

any other carrier by railroad, by pipe line, or by water, when a through rate and joint rate have been established.''

The common carriers subject to the provisions of that act are interstate carriers, and it is not disputed in this case but that the shipment was an interstate shipment. Neither is it disputed—but if so it is established without contradictory proof—that at the time of the shipment involved there had been filed with the Interstate Commerce Commission, in compliance with the Interstate Commerce Act, a schedule for rates of this character of shipment between Hot Springs, Arkansas, and Louisville, Kentucky, and it is likewise admitted that the freight between the two points mentioned on this character of shipment under the schedule so filed was $261.90 instead of $176.10, the amount paid at Hot Springs. A fact equally well established is that the agent at Hot Springs made a mistake in naming the total amount of freight between the two points. It has been frequently determined by the Federal courts, as well as this court, since the passage of the Interstate Commerce Act, that both shipper and carrier are bound by the schedule of rates in the report filed with the commission, and that to charge any less rate, whether through mistake or otherwise, would be giving a preferential one, and therefore illegal and void. Chesapeake & Ohio Ry. Co. v. Maysville Brick Co., 132 Ky. 643; Illinois Central R. R. Co. v. Henderson Elevator Co., 138 Ky. 220, 226 U. S. 441; Louisville & Nashvillee R. R. Co. v. Coquillard Wagon Works, 147 Ky., 530; Louisville & Nashville R. R. Co. v. Allen, 152 Ky. 145; Gulf, Colorado & Sante Fe Ry. Co. v. Hefley, 158 U. S. 98; Texas & Pacific Ry. Co. v. Mugg, 202 U. S. 242; Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426; Texas & Pacific Ry. Co. v. Cisco Oil Mill, 204 U. S. 449; Kansas City Southern Ry. Co. v. Alvers Commission Co., 223 U. S. 573; Illinois Central Railroad Company v. Henderson Co., 226 U. S. 441; Kansas Southern Ry. Co. v. Carl, 227 U. S. 639; Pennsylvania R. R. Co. v. International Coal Co., 230 U. S. 187, 197; Boston & Maine R. R. Co. v. Hooker, 233 U. S. 97, 110-113; George N. Pierce Co. v. Wells, Fargo & Co., 236 U. S. 278, 284; Louisville & Nashville Railroad Co. v. Maxwell, 237 U. S. 94, and Southern Railway v. Prescott, 240 U. S. 632.

The failure to post a copy of the rate in the stations of the carrier will not relieve its binding effect upon each of the parties to the contract of shipment. Texas & Pacific Ry. Co. v. Mugg, Boston & Maine Railroad Co. v. Hooker, Louisville & Nashville Railroad Company v. Allen, *supra*, and Chicago & Alton Railroad Co. v. Kirby, 225 U. S. 155. Neither is it necessary for the shipper to have knowledge at the time of the shipment of the rate fixed in the schedule filed with the commission, since he will conclusively be presumed to have such knowledge arising from the filing of the schedule with the commission. Kansas Southern Ry. Co. v. Carl, and Louisville & Nashville Railroad Company v. Maxwell, *supra*.

From these authorities it is clearly established that in this case it was the duty of the carrier to collect and the duty of the shipper (plaintiff) to pay the freight demanded for the character of shipment as specified in the schedule of rates filed with the commission, and the fact that a mistake had been made in the naming of that rate by the agent at Hot Springs can not relieve either party from the obligation imposed upon them to perform their respective duties in the premises. Having the right as well as being under a legal duty to collect the balance due on the shipment, of $85.80, the defendant, Louisville & Nashville Railroad Company, had a lien upon the shipment for that balance, and it could decline to deliver the horses until it was paid. Boggs & Russell v. Martin, 13 B. Mon. 239; Thomas v. Frankfort & Cincinnati Railroad Co., 116 Ky. 879; Corpus Juris, vol. 10, page 460, and a number of the cases *supra*. This being the condition of the law, the defendants were clearly within their legal right in declining to deliver the shipment until the balance of the freight bill was paid. Indeed if they had not collected that bill they would have subjected themselves to a penalty for discrimination, and they were not bound to part with possession of the shipment and thereby release their lien by accepting the promise or other obligation of the plaintiff to subsequently pay it.

It is insisted, however, that under the rule laid down in Hutchinson on Carriers, vol. 2, sec. 646, and the case of Kelly v. Adams Express Co., 134 Ky. 208, it was the duty of the defendant, Louisville & Nashville Railroad Co., after being informed that the horse, "Bookie,"

was sick, to do for him that which might reasonably be expected of a prudent and careful person, even to the extent of incurring expenses in relieving, looking after and caring for him by taking him from the car and putting him in a place where he could have been more conveniently treated and better cared for. But under the facts of this case the doctrine of the authorities relied on has no application, for it does not contemplate an injury growing out of the failure of the shipper to perform some legal duty as is the case here. It was within the power of plaintiff to obtain immediate possession of his horses and to unload them at once upon their arrival by paying the balance of the freight due. He had an agent and representative present who had come from Hot Springs, Arkansas, to Louisville, Kentucky, with the horses. And the fact, if it be a fact, that such agent did not have the money to make the payment at the time furnishes no excuse. It was plaintiff's duty to furnish him the money, since plaintiff was presumed to know what the legal rate was, and to know that it would be unlawful for the shipment to be delivered to him or his agent without the payment of that legal rate. But counsel for plaintiff in his brief says: "If the defendants, by the negligent and erroneous quotation, produced a situation which, while being straightened out, resulted in delay to which the death of this animal may be fairly and reasonably attributed, we are aware of no principle on which they can escape liability." The trouble with this contention is that it ignores the presumed knowledge of plaintiff with reference to the rate, and it assumes that he was privileged to take all the time he desired to "straighten out" the situation when it was his legal duty, as we have seen, to pay the balance of the freight, which if done, would have immediately "straightened out" the situation so that no delay in the unloading of the shipment would have resulted. It was, therefore, plaintiff's fault that the stock was kept in the car from the time of its arrival on the afternoon of April 13 until the next day. Since this is the only dereliction charged against either of the defendants in the petition, and since this, as we have found, was justifiable, there was no other course open to the lower court but to give the peremptory instruction complained of.

Wherefore, the judgment must be and it is affirmed.