## Citizens Telephone Company v. City of Newport, et al.

(Decided May 11, 1920.)

### Appeal from Campbell Circuit Court.

1. Contracts—Construction—Intention of Parties.—In the construction of contracts the intention of the parties as gathered from the language employed should be administered, and in ascertaining the meaning of the language, words should be given the meaning in which they are usually and ordinarily understood, unless it is apparent from the context that some other meaning was intended to be attached, and the "intention of the parties" within the above rule is the expressed intention and not what they may have intended but failed to express.

2.    Contracts—Construction.—In construing contracts consisting of
      two or more separate, independent writings, all of them should
      be considered and construed together according to the above rule.
3.    Municipal Corporations—Ordinances—Telephone Franchise.—An
      ordinance of the city of Newport created a telephone franchise
      and stated that the written bid of the purchaser and his bond,
      together with the ordinance creating the franchise, should con-
      stitute the contract between the parties.   The only portions of
      the ordinance referring to telephone rates or charges were sec-
      tions 2 and 20, the first of which required the bid to state the
      character of service proposed by the bidder, his ability to furnish
      telephone connections, and other facts not pertinent; while the
      other section provided for an automatic reduction of the sub-
      mitted rates, if the bidder himself, or through another company
      in which he had an interest, should afterward acquire and oper-
      ate a telephone system in adjacent named cities at a lower rate
      than that contained in his bid, in which case the submitted rates
      should be automatically reduced to those in the adjacent city.   It
      further provided that the successful bidder should charge "no toll
      in addition to said rates above provided  .  .  .  for telephone
      connection between the subscribers to its system in Newport and
      subscribers in adjoining cities, including the Cincinnati, Ohio ex-
      change district."   There was nothing in the submitted bid obli-
      gating the purchaser to give free service to any of its subscrib-
      ers with subscribers' in any adjoining city.   Held, that neither
      the ordinance nor the bid, the bond, nor all of them together
      created an obligation on the part of the purchaser to furnish
      free messages to Newport subscribers to any of the adjoining
      cities in which it did not itself, or by another company in which
      it had an interest, operate a telephone system.

MILLER   OUTCALT,   MYERS   &   HOWARD  and   TRABUE,
DOOLAN, HELM & HELM for appellant.

BRENT SPENCE for appellees.

Opinion of the Court by Judge Thomas—Reversing.

The general council of the city of Newport passed
an ordinance creating a franchise within the city for the
purpose of constructing, maintaining and operating a
telephone system therein, which ordinance was approved
on October 6, 1909, and the city clerk, pursuant to di-
rections contained therein, advertised the place and time
for the sale of the created franchise, at which sale the
appellant and defendant below, the Citizens Tele-
phone Company, being the best bidder, became the pur-
chaser.  Its bid, pursuant to the terms of the ordinance,
was in writing, and was submitted to the clerk, in which
the defendant stipulated, as section 2 of the ordi-

nance required it to do, the maximum charges for services which would be made by it if its bid was accepted throughout the term of twenty years of the franchise. Those rates as contained in the bid are:

### "UNLIMITED SERVICE.

Covering all outward and inward local messages.

Business purposes, direct line ............$100.00 per yr.
Residence purposes.

Direct line ........................................................ 48.00 per yr.
2 party line .................................................... 20.00 per yr.

### MEASURED SERVICE.

A charge for each local outgoing message, inward calls free.

Business purposes. Direct line .................. $48.00 per yr.
Allowing 600 local outgoing calls per year
Additional local calls ..........................................3c each.

### GUARANTEED SERVICE.

5c for each local outgoing message of 5 minutes' duration, incoming calls free. Stations equipped with coin-receiving device into which money is deposited for each call.

### BUSINESS PURPOSES.

Direct line. Guarantee ................................ $5.00 per month
4 party line. Guarantee ...........................10c per day.

### RESIDENCE PURPOSES.

4 party line ....................................................5c per day

Note.—The above rates apply to stations located not to exceed two miles from the exchange. Other portions of the bid dealt with 'extension telephone,' 'extension bells,' and 'extra listings,' none of which have any bearing upon this controversy."

The submitted bid of the defendant was duly accepted, and it constructed its system as required by the terms of the ordinance and has continued to operate it, except during the period of the Great War, when it was taken charge of by the United States government.

This suit was filed by the city of Newport and two of its citizens, who were subscribers to defendant's telephone system, alleging that defendant was imposing higher rates and charges upon its subscribers in New-

port than that stipulated in its bid, and it was sought to be enjoined from doing so.

The answer as amended denied the averments of the petition and alleged that at the time it purchased the franchise under the ordinance and at the time it made, and the city of Newport accepted, its bid, it was a Kentucky corporation, and neither owned nor operated a telephone line from Kentucky into Cincinnati, Ohio, nor did it own or operate, by itself or by any company in which it had an interest, any telephone system in the city of Cincinnati, but, on the contrary, at that time the Cincinnati & Suburban Bell Telephone Company, an Ohio corporation, owned and operated a trunk telephone line from the city of Covington into the city of Cincinnati, and owned and operated a telephone system throughout the city of Cincinnati and throughout the Cincinnati, Ohio, exchange district; that defendant neither had at that time, nor has it since had, any interest or beneficial connection with the Cincinnati & Suburban Bell Telephone Company (hereinafter referred to as the Ohio corporation); that from the time it began its operation in the city of Newport up to the taking over of the telephones of the country by the Federal Government as a war measure, "by arrangment between this defendant and said Ohio corporation, said Ohio corporation afforded to the telephone subscribers of this defendant, residents of the city of Newport, Kentucky, telephone service at the rate or charge nominated in said bid. And this company, in return for said service, at the same time, rendered similar service to the subscribers to the Cincinnati exchange of said company, by giving them connection with the telephone subscribers to its, this defendant's, exchange;" that since the turning back of the telephone properties by the Federal Government to the owners, the Ohio corporation declines longer to follow the mutual arrangment for free exchange of messages between its subscribers and those of defendant, and has fixed a charge of ten cents for interstate messages between Newport and Cincinnati, which charge defendant insists it has the right to pay to the Ohio corporation and to collect it from the subscribers who incurred it. It develops that the right of the defendant to charge and collect from its subscribers in Newport this ten cent message fee is the only question involved in this case.

Another defense relied on was that if the ordinance and defendant's bid could be construed into a contract whereby the latter agreed to furnish to its Newport subscribers free service throughout the Cincinnati, Ohio, exchange district, it was void because beyond the authority of the city of Newport to make, it being contended that its authority to fix rates in the franchise contract must be confined to rates within its corporate limits.

Still another defense was that if the ordinance and defendant's bid created an obligation on the part of defendant to furnish the free service to its Newport subscribers, as insisted by plaintiffs, that contract was subject to the right of congress, under its power over interstate commerce, to regulate or annul, and that by the acts of congress in amending the interstate commerce act—one passed in 1910, approved June 18, 1910, and the other passed in 1920, approved February 28 of that year —the Federal Government assumed control over interstate telephone messages, and that the Ohio corporation having, according to the provisions of those acts, filed a schedule of tariffs with the interstate commerce commission, for interstate messages such tariffs superseded and annulled prior existing rates for such messages, although they existed by virtue of contract, in support of which the cases of L. & N. Ry. Co. v. Mottley, 219 U. S. 467; Croninger v. Adams Express Co., 226 U. S. 491; M. K. & T. R. R. Co. v. Harriman Brothers, 227 U. S. 657; Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426; B. & O. R. R. Co. v. Pitcairn Coal Co., 215 U. S. 481; L. & N. R. R. Co. v. Allen, 152 Ky. 145; L. & N. R. R. Co. v. Miller, 156 Ky. 677; Adams Express Co. v. Cook, 162 Ky. 592, and Western Union Telegraph Co. v. Lee, 174 Ky. 210, together with others, are relied upon.

The demurrer filed to the answer as amended, and each paragraph thereof, was sustained, and defendant declining to plead further, judgment was rendered holding that the ordinance for the sale of the franchise and defendant's bid imposed the obligation upon the latter to furnish to its Newport subscribers free service throughout the Cincinnati, Ohio, exchange district, which included the city of Cincinnati, and surrounding suburbs. The defendant was also enjoined from collecting any charges from its Newport subscribers greater

than those stipulated in its bid, the effect of which was to enjoin it from collecting the ten cents imposed by the Ohio corporation for messages of any of defendant's Newport subscribers into any of the territory covered by the Cincinnati, Ohio, exchange district. Complaining of that judgment, defendant prosecutes this appeal.

Clearly the first question to be determined is whether there exists a contract between the city of Newport and the defendant obligating the latter to render the service which the former insists upon. For if there exists no such contract, a consideration of the other questions will be unnecessary. Whether such contract exists must be determined from the terms of the ordinance and those of that portion of defendant's bid which we have heretofore incorporated.

The ordinance consists of twenty-eight sections, only two of which refer or in any wise relate to the charges which the successful bidder may make under his purchased franchise. Those sections are numbers 2 and 20, and are in these words:

"Section 2. Each bidder shall state in his bid the kind or kinds of service that he will render, what service he can give by way of telephone connections with the surrounding territory or adjacent cities, and shall be prepared to furnish evidence of his ability to render the service that he may set forth in his bid, each bidder shall state in his bid the maximum prices for which he will furnish customers and subscribers, telephone service, stating the kinds of service and their respective prices.

"Section 20. It is a condition of this franchise that the successful bidder, in the event that he shall furnish, either through himself or through some person or company in which he has an interest, telephone service of the same or similar character of service in Cincinnati or Covington, or any of the cities adjoining the city of Newport, either now or hereafter, at rates less than the rates that may be prescribed in his bid, then and thereupon the prices charged under this grant and his bid shall be reduced so as to correspond with the lower rates aforementioned, and any subsequent reduction of rates by said successful bidder or person or corporation in which the successful bidder may have an interest in any of said adjacent cities shall work a corresponding reduction of the rates under this franchise. No toll in addition to said rates above provided for shall be

charged by said successful bidder for telephone connection between the subscribers to its system in Newport and subscribers in adjoining cities including the Cincinnati, Ohio, exchange district.''

Other sections relate to the manner in which the system shall be constructed, the life of the franchise, the number of free telephones to be furnished for the use of the city, the indemnifying of the city against damages during the construction of the system, and other matters wholly foreign to the question involved except that section 27 provides that the ordinance, the bid, and the required bond shall constitute the contract between the city and the successful bidder.

It is perfectly apparent, and indeed we find no contention of counsel to the contrary, that there appears nothing in defendant's bid remotely pointing to any contractual obligation to furnish free service for messages into the city of Cincinnati, Ohio, or its exchange district. On the contrary, a literal interpretation of that part of the bid dealing with ''measured service'' would rather indicate that there should be a charge ''for each local outgoing message,'' but that inward calls should be free. Color is given to this interpretation when under the heading of ''unlimited service,'' in the bid, the maximum rates are much higher, but include ''all outward and inward local messages.'' At any rate it is not contended that anything contained in the rates stated in the bid creates the obligation insisted upon. But, since the acceptance of the franchise which the ordinance created would bind the defendant to the performance of all of its obligations, our next duty is to see whether the ordinance contains terms sufficient to create the contract contended for.

Section 2 provides that the successful bidder shall state in his bid the kind of service that he will render, what service he can give by way of telephone connections with surrounding territory and adjacent cities, the maximum rates to be charged for each particular service, and that he shall furnish evidence of his ability to render the character of service stated in his bid. Surely it can not be contended that there is anything contained in that section even resembling an obligation by defendant to furnish free telephone service to its subscribers into points outside of the city of Newport. The required statements were evidently meant only to furnish data

upon which the city might act in accepting or rejecting the bid. But, if the required statement relating to furnishing telephone connections could be construed into a contract to furnish such service upon the acceptance of the bid containing the statement, then clearly it would not apply except as to connections with such surrounding territory and adjacent cities as might be contained in the bid, and nowhere do we find in the latter any statement of defendant's ability to furnish telephone connections to and with the city of Cincinnati, Ohio, or its exchange district.

Section 20 of the ordinance only purports to deal with the automatic reduction of rates to defendant's Newport subscribers in the event it shall furnish, through itself or some company in which it has an interest, the same or similar telephone service in Cincinnati, Ohio, Covington, Kentucky, or any of the cities adjoining Newport. The provision therein is that if at the time, or at any time thereafter, the defendant should furnish the same services to any of the surrounding cities at rates less than those contained in its bid, then such rates should be automatically reduced to a level with similar rates furnished to the adjoining city or cities. The language of the ordinance is, "then and thereupon the prices charged under this grant and his bid shall be reduced to correspond with the lower rates aforementioned." Manifestly, the rates *aforementioned* refer to the lower rates which might, under the conditions of the section, be furnished by defendant to any of the cities adjoining Newport, and for which automatic reduction was provided. It can not refer to any rates in any other part of the ordinance, because in section 20 is the first place the word "rates" appears. The last sentence of section 20 stipulates that "no toll in addition to said rates above provided for," shall be charged by the successful bidder for telephone connections to its Newport subscribers and subscribers in adjoining cities, including Cincinnati, Ohio, exchange district. There can be no doubt that the phrase in this last sentence, "said rates above provided for" refers to the same automatically reduced rates as the phrase "lower rates aforementioned," contained in a former part of the section.

The fundamental rule for the interpretation of statutes, as well as other writings, is that the language em-

ployed should be given its plain and ordinarily understood meaning, which rule would seem to require the above interpretation of section 20 of the ordinance. But if the language were such as to create a possible doubt as to the meaning, then, under the well established doctrine of the "last antecedent," it would be our duty to construe the phrases in section 20, "rates aforementioned," and "rates above provided for," to refer to the last antecedent, which is the automatically reduced rates referred to by the section. This rule for the construction of statutes is thus stated in 36 Cyc. 1123:

"By what is known as the doctrine of the 'last antecedent,' relative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including others more remote, unless such extension is clearly required by a consideration of the entire act." We find no such requirement in the entire contract here involved.

We have seen that there is no "more remote" antecedents in the ordinance to which those phrases might refer, since, as we have seen, the word "rates" appears for the first time in the section under consideration. Clearly the last sentence in section 20 of the ordinance, forbidding the collection of tolls for connections with the cities surrounding Newport was inserted to prevent the successful bidder, under the conditions named therein, from charging more than the automatically reduced rates under the guise of collecting the toll for telephone *connections*. But at most that section can not be construed into an obligation on the part of the successful bidder to furnish free telephone connection, except as to such cities surrounding Newport, including Cincinnati, Ohio, in which such bidder shall furnish telephone service of the same character submitted in its bid, through itself or some company in which it has an interest, and it is admitted that defendant has never furnished such service by any of the methods stipulated in the city of Cincinnati, Ohio, or in any portion of that city's exchange district. So that, under any view which may be taken as to the meaning of section 20 of the ordinance, it can not be held that the defendant, in becoming the successful bidder for the franchise, obligated itself to furnish the service contended for.

If it was the intention of the parties to contract for free service for defendant's Newport subscribers to its system erected under the franchise, into and throughout the Cincinnati, Ohio, exchange district, it is marvelously strange that somewhere in the carefully prepared ordinance of 28 sections they did not say so in clear terms, and not leave this *most important feature* to be inferred from a sentence inserted in a section dealing only with automatically reduced rates to be furnished only upon conditions therein specified; and that, too, in spite of the fact that the specified conditions do not, nor never did exist with reference to that district.

It is strenuously insisted that because such services were furnished under traffic arrangement with the Ohio corporation for some eight or nine years, that defendant thus contemporaneously construed its contract as obligating it to furnish them. In the first place the pleading to which a demurrer was sustained refutes this contention by alleging that such free service was by mutual exchange of service between defendant and the Ohio corporation, and to accommodate their respective customers. Furthermore, it is the settled practice of the courts to disregard the doctrine of contemporaneous construction, except in cases where the language to be construed is so uncertain, ambiguous and doubtful as to justify the application of the doctrine. It is never invoked in the absence of such uncertainty, ambiguity or doubt. Nor can such mutual arrangement, although observed for a long period, ripen into a contract from mere continued observance during which time the complaining parties (plaintiffs and others whom they represent) were obtaining more than their contract gave them. Rural Home Telephone Co. v. Kentucky & Indiana Telephone Company, 128 Ky. 209; Clarke v. Rogers, 159 Ky. 762, and 13 Corpus Juris 548.

Neither are we at liberty to infer a contract on the part of the defendant to render the services contended for on the ground that it was the presumed *general intention* of the parties to provide therefor, since in the construction of contracts or other writings the intention to be enforced by the courts as gathered from the language employed is the one which the words in their usual and ordinary meaning express, and not the one which the parties may have intended to but did not express. Bedford v. Bedford, 99 Ky. 284; Howard v. Cole, 124

Ky. 816; Fowler v. Mercer, 170 Ky. 256; Gutherie v. Gutherie, 168 Ky. 805; Wickersham v. Wickersham, 174 Ky. 604; Eichorn v. Morat, 175 Ky. 80; Shields v. Shields, 185 Ky. 391; Phelps v. Stoner, Idem. 466; Prather v. Watson, 187 Ky. 709; Triplett v. Gill, 7 J. J. Mar. 432; Kelley v. Bradford, 3 Bibb 317, and 13 Corpus Juris 523.

Having reached the conclusion that there exists no contract between the defendant and plaintiff for the free service contended for, and there being no other objection to the collection of the ten cent message charge made by the Ohio corporation, it results that the court erred in granting the injunction, which conclusion renders it unnecessary to consider the other question raised by the answer.

The conclusions reached are meant only to apply to the questions of free messages into the Cincinnati, Ohio, exchange district, it being the only one involved in this case. Where the defendant has acquired and operated telephone systems in adjoining cities to Newport, as it has in Covington and perhaps others, a different question would be presented, to which the reasons for this opinion would not apply.

Wherefore, the judgment is reversed with directions to dismiss the petition, and for proceedings consistent with this opinion. Chief Justice Carroll dissenting.

DISSENTING OPINION OF CHIEF JUSTICE CARROLL.

I must dissent from the opinion because I am thoroughly convinced that the court by misconstruction of the contract between the city of Newport and the telephone company has relieved the telephone company of a material obligation that it voluntarily entered into a contract with the city to perform, and has put on users of telephones in the city a burden in the way of an extra telephone fee they should not be required to bear. I think I will be able to show, in the most convincing way, the correctness of my position, not only by the very letter of the contract itself but also by the pleadings of the telephone company, by exhibits made by it, and its course of conduct for ten years under the contract.

Before coming to consider the contract, a few preliminary facts may be stated that will throw important light on the purpose of the contract and the intention of the parties in entering into it.

Newport and Covington, Kentucky, and Cincinnati, Ohio, as well as the adjacent Kentucky smaller cities of Dayton, Bellview, Ludlow, Ft. Mitchell, Bromley, Eismere, Clifton and Southgate and probably others are for all practical purposes one large city. Newport, with a population of probably forty thousand, is separated from Covington, with a population of over fifty thousand, by the Licking river; and Cincinnati, with a population of nearly a half million, is separated from Covington and Newport by the Ohio river, which at that place is so narrow that a person may go from the business part of Newport to the business part of Cincinnati in about five minutes. Under these circumstances, it can be well understood that the social, as well as the business relations between the people living in these cities, are very intimate, and that telephone service between these cities is more necessary for the convenience of the people, especially in the cities of Newport and Covington, than would be telephone service confined to either of the cities.

In view of these conditions, it is fair to assume that one of the chief purposes of the city of Newport in entering into this contract was to enable its citizens to have, without fees or charges other than specified in the contract, telephone service to and from Covington, Cincinnati and the other adjacent Kentucky cities mentioned. I do not need, however, to take it for granted that this purpose was prominently in the minds of the city council of Newport, because the ordinance under which the contract was made expressly provided in section 2 that: "Each bidder shall state in his bid the kind or kinds of service that he will render, what service he can give by way of telephone connections with the surrounding territory or adjacent cities, and shall be prepared to furnish evidence of his ability to render the service that he may set forth in his bid, each bidder shall state in his bid the maximum prices for which he will furnish customers and subscribers, telephone service, stating the kinds of service and their respective prices."

This section makes it plain that the bidder would be expected to make its bid and fix its price for service, with the understanding that the service should take in the cities of Covington and Cincinnati, as well as other adjacent cities in the surrounding territory, and it cannot be doubted that when the telephone company made

its bid it intended to and did take into consideration and submit the character of service that it would give in the surrounding territory and these adjacent cities, and the prices at which it would perform the service.

Now let me examine the bid of the telephone company, keeping in mind the provision of section 2 that the bidder should state in his bid "the kind or kinds of service that he will render, what service he can give by way of telephone connections with the surrounding territory or adjacent cities, . . . stating the maximum prices for which he will furnish customers and subscribers telephone service."

In this bid, it set out in detail, as may be seen from the opinion, the character of service that it would give and the prices it would charge therefor, and I confidently submit that this bid, when read in connection with the proposition submitted by the city, is not susceptible of any other construction than that the prices specified were the sums for which it would furnish telephone service not only in the city of Newport but in the surrounding territory and adjacent cities. It seems to me, with all due respect to the court, absurd to say that this bid did not cover service in Cincinnati. It expressly provides that if it is accepted, the company "will furnish, during the life of said franchise, the following kind of telephone service, with the following maximum rates;" and yet the court holds that this service and these rates did not include the city of Cincinnati in the face of the fact that the proposition submitted by the city, without limitation or qualification, requested a bid that would include service in the territory surrounding and cities adjacent to Newport, and in the face of the further fact that the bid specified the service as well as the prices.

But this is not the only evidence furnished by the contract (which consisted as provided in section 27, of the ordinance and the bid), that the service contracted for included the cities of Cincinnati, Covington and other cities adjacent to Newport, as well as surrounding territory. I refer now to section 20 of the contract, which provides that: "It is a condition of this franchise that the successful bidder, in the event that he shall furnish, either through himself or through some person or company in which he has an interest, telephone service of the same or similar character of service in Cincinnati

or Covington or any of the cities adjoining the city of Newport, either now or hereafter, at rates less than the rates that may be prescribed in his bid, then and there4 upon the prices charged under this grant and his bid shall be reduced so as to correspond with the lower rates aforementioned, and any subsequent reduction of rates by said successful bidder or person or corporation in which the successful bidder may have an interest in any of said adjacent cities shall work a corresponding reduction of the rates under this franchise. No toll in addition to said rates above provided for shall be charged by said successful bidder for telephone connection between the subscribers to its system in Newport and subscribers in adjoining cities including the Cincinnati, Ohio, exchange district.''

Much is said in the opinion in support of the proposition that the last sentence in this section, reading: ''No toll in addition to said rates above provided for shall be charged by said successful bidder for telephone connection between the subscribers to its system in Newport and subscribers in adjoining cities, including the Cincinnati, Ohio, exchange district,'' has reference only to the reduced rates that might come into effect if the conditions provided for in the other part of this section should come into existence, the argument being made at length that the meaning of this last quoted sentence is that if the lower rates contemplated by the remainder of the section should become effective, that no toll in addition to these rates should be charged.

With the correctness of so much of the opinion as is devoted to this matter, I have no fault to find, as it seems to me plain that the application of this last quoted sentence should be confined to section 20. It will be observed, however, that in section 20 it is provided that if this telephone company should either through itself or some other person or company in which it had an interest furnish service in ''Cincinnati, Covington or any of the cities adjoining the city of Newport, that the rates fixed in the contract with Newport should be reduced to correspond with the rates charged in the cities mentioned.''

Now, if this company was not obliged by its contract to furnish service at the rates specified in this contract in Cincinnati, Covington and other cities adjoining the city of Newport, why should there have been inserted

in the contract the provision that if under the conditions described in section 20, lower rates should be charged in these cities than in Newport that the Newport rates should be reduced accordingly?. If this contract did not include service in these cities, what other possible reason can be assigned for requiring this company if it or some other company in which it was interested should furnish lower rates in these cities to reduce its Newport rates? If it was not required by its contract to furnish service at the rates specified in the contract to Cincinnati and the adoining cities, under what possible pretense. could it be demanded that it should under the conditions contemplated by section 20, if they ever arose, give correspondingly reduced rates to Newport subscribers? When section 20 speaks of reducing the Newport rates to correspond with rates that it or any other telephone company in which it may be interested might charge ''in Cincinnati, Covington or any of the adjoining cities of Newport,'' it necessarily follows that the contract must have included the cities mentioned and described or else there would be no meaning or sense in section 20.

It accordingly seems plain to me that the contract did provide that this company should furnish service at the rates therein specified in the cities mentioned and, therefore, it was further stipulated in the contract that if it or any other company in which it was interested should give lower rates than were specified in this Newport contract to Cincinnati, Covington or other adjoining cities, the Newport rates specified in this contract should be reduced to correspond with these rates.

It will thus be seen that in section 2, of the contract, the bidder was required to specify the kind of service it could give in the cities adjacent to Newport, as well as the surrounding territory, and the prices it would charge therefor; and that in section 20, it was further stipulated that if the bidder or any company in which it was interested should furnish lower rates than specified in its bid to Cincinnati, Covington or to the cities adjoining Newport, the rates specified in its bid should be reduced to conform to the rates in these other cities, thereby making it, I again repeat, so plain that there should be no ground for difference of opinion that it was contemplated by the parties to this contract and specified in the contract that the rates agreed in the contract to

be charged should embrace service not only in Newport, but in Cincinnati, Covington and other adjacent cities.

It is, however, said in the opinion that Cincinnati and the adjacent cities are not mentioned in the bid. Why should they be when section 2 of the contract expressly stipulates that the bidder should name the rates at which it would furnish service, including these cities, and further agreed if the conditions arose mentioned in section 20 it would reduce these rates?

It is further plain from this contract that if this company is not obliged to furnish for the contract rates specified, service in Cincinnati, neither is it obliged to furnish such service in Covington, Ludlow, Ft. Mitchell, Bromley, Elsmere, Bellview, Darton, Clifton and Southgate, other cities adjacent to Newport. Under the contract, all these cities, including Cincinnati, are in the same class. The contract treats all of them exactly alike. If the contract applies to one, it applies to all. If it does not apply to one, it does not apply to any. Therefore, when this court holds that the contract does not apply to Cincinnati, it in purpose and effect holds that it does not apply to Covington or either of the other cities I have mentioned, because in construing the contract neither can be separated from the other.

Yet, curiously enough, this company does not question in its pleadings in this case or in its argument its duty to furnish for the rates specified in this contract the service to Covington and the other cities mentioned except Cincinnati. It agrees that its contract obliges it to give service in all these cities, except Cincinnati, for the rates specified in the contract, and this admission on its part is in itself conclusive of the proposition that its contract embraced Cincinnati, because Cincinnati can not be separated from the other cities and put in a class by itself.

It further follows from the opinion that as Cincinnati is not embraced in the contract neither are any of the other cities, and, therefore, on a return of the case this company may charge an additional fee to its Newport subscribers for service in each and all of these adjacent cities; and if it does this—as under the opinion it may do—there will be put upon Newport subscribers, by the wholly unwarranted construction of the contract, a burden never even thought of by the telephone company before the opinion of this court was handed down.

In this connection, I want further to say that if this company can charge 10 cents extra for Cincinnati calls, it may with equal legal right charge 20 cents or 30 cents, because if the contract does not control the Cincinnati rates, then it is at liberty to charge such rates as it pleases. If, on the return of this case, this company should charge an extra fee for service to Covington and the city should seek to enjoin it from so doing, it would necessarily be held under the opinion that it had the right to exact the extra charge, because, as I have said, if the contract does not include Cincinnati, neither does it include Covington.

It is further said in the opinion that the only reason the company exacts this additional rate for Cincinnati service is because the Cincinnati exchange will not accept its messages without the payment of this additional rate, although when the contract was entered into and until 1919, it gave this Cincinnati service without extra charge. But the mere circumstance that the Cincinnati exchange now exacts a fee for service that it rendered theretofore without charge cannot modify or affect in any way the contract between the city of Newport and the telephone company.

I attach no importance to the fact that the Newport company did not own or have an interest in the Cincinnati company, or to the fact that when the contract was made and for ten years thereafter the Cincinnati company furnished it free service, nor can I understand how these circumstances can be tortured into a right on the part of the Newport company to violate its contract with the city of Newport. The Newport Telephone Company had the undoubted power to contract with the city of Newport in consideration of the franchise granted it to furnish service in adjacent cities to Newport subscribers at the rates specified in its bid and without reference to what other telephone companies might be required to assist in the transmission of messages or what they might charge for the service and the city had the power to impose such a condition.

It cannot for a moment be maintained that a party to a contract is not bound by the terms of his contract merely because in its performance he may be required to obtain service, labor or material from third parties, who are strangers to the contract, or who have no direct or indirect connection with it at higher prices than he

expected to pay when the contract was made. When this Newport Telephone Company made this contract, obliging it to furnish Cincinnati service, the means by which it would be enabled to perform the service was no concern of the city. Whether the Newport Telephone Company could secure this Cincinnati service free of charge or upon the payment of a fee was a matter over which the city had no control.

I have never before seen it announced by any court that a party, who made a contract obliging him to furnish labor, service or material, might violate his contract merely because a third party that he expected when the contract was made would furnish labor, service or material free or at a reduced rate, declined to furnish the service, labor or material free òr at the price contemplated when the contract was made. If such a rule as this should become the law of the land, then no person making a contract with a party who must depend on others, not parties to the contract, to furnish some part or all of the service, labor or material necessary in its execution, would ever feel safe that his contract would be performed. The contract was one that both parties had the right to enter into, and change of conditions does not relieve either of them from its performance. If, as I maintain, the telephone company was obliged by its contract to furnish Cincinnati service without extra charge, the fact that the Cincinnati exchange now requires from the telephone company an extra charge does not justify the company in putting this extra charge on its subscribers in violation of its contract. As between it and the Cincinnati exchange it may be required to pay this extra fee. That is a matter with which Newport subscribers are not concerned; it lies wholly between the Cincinnati exchange and the telephone company.

It may be that this extra charge now made by the Cincinnati exchange will reduce the income of the Newport telephone company to such an extent as to make the service unprofitable, but this circumstance furnishes no reason whatever for allowing it in violation of its contract to transfer this extra burden to its subscribers. The terms of a valid contract cannot be affected by the fact that changed conditions or increased cost of labor or material makes it unprofitable for one of the parties to perform its contract. The extra charge made by the Cincinnati exchange does not make the con-

tract impossible of performance; it merely puts a heavier burden on one of the parties to the contract than was contemplated when the contract was entered into, but if this fact would relieve it from its contract obligation, the security of contracts would be virtually destroyed, and no person who made a contract would feel sure that the other party could be made to perform.

But fortunately for the security of contracts, it is an elementary and established principle that change in conditions arising after the contract has been entered into will not relieve either of the parties from its performance although performance may involve loss in place of profit. There is no disagreement among the authorities on this subject, and in support of it I shall only cite a few cases, among them Columbus Railway, Power and Light Co. v. City of Columbus, 249 U. S. 399, —— Law Ed. ——.

In that case, as appears from the opinion, the power and light company entered into a contract with the city of Columbus to furnish service at rates specified in the contract. After the contract had been carried out for a number of years, the late war so increased the cost of labor and material that the company could not perform its contract without loss, and to be relieved of the burden of operating under the contract at rates that were confiscatory under the new conditions, the company brought suit against the city to enjoin it from interfering with its right to charge higher rates then were specified in its contract. There was no dispute about the facts, and when the case came to the Supreme Court of the United States, that court held that the changed conditions, the high cost of labor and material, the loss that would be suffered by the company if compelled to perform its contract did not relieve it from its contract obligation, saying that: "If a party charge himself with an obligation possible to be performed, he must abide by it unless performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties will not excuse performance. Where the parties have made no provision for a dispensation, the terms of the contract must prevail. One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking."

To the same effect is Page on Contracts, vol. 3, section 1397; Stevens v. Vaughn, 4 J. J. Marshall 206; Shanks v. Griffin, 14 B. Monroe, 153; Newport News Railroad Co. v. McDonald Brick Company, 109 Ky. 408; Bates Machine Co. v. Norton Iron Works, 113 Ky. 372; Gravelswitch Telephone Co. v. Lebanon Telephone Co., 139 Ky. 151.

I want to further say in this connection that the admissions of the company make it clear that it rests its claim of right to make this extra charge for Cincinnati service upon the ground that the increase in the cost of labor and material, in connection with the added charge demanded by the Cincinnati exchange, made it impossible for it to perform its contract without suffering loss and, therefore, it seeks to be relieved of its contract obligation, and this court in the opinion has granted this relief, although as I have pointed out this new and changed condition, however costly it may make Cincinnati service to the company, furnishes no reason for exempting it from its contract obligation.

I, therefore, repeat that the mere fact that the Newport company, when the contract was made, and for ten years prior thereto obtained Cincinnati service without cost to it, does not relieve it from its obligation under the contract merely because now it must pay for the service.

The court had presented to it by the telephone company the alternative of relieving it from its contract obligation, either upon the ground that the contract did not oblige it to furnish for the rates specified in the contract Cincinnati service, or upon the ground that because the Cincinnati exchange exacted from it this extra charge, it had the right to pass the charge on to its Newport subscribers and compel them to pay it.

With these alternatives before it, the court could not, without putting itself in conflict with all the law upon the subject, rule that the fact that the Cincinnati exchange exacted this extra fee gave the telephone company the right to charge more than its contract rate to compensate it for the loss sustained in the payment of this extra charge to the Cincinnati exchange; and, therefore, it has adopted the other alternative and holds that the contract does not require Cincinnati service at the contract rates. Although I might stop here to say that it would have been much better for the Newport sub-

scribers if the court had boldly disregarded the law of the case and said that the telephone company had the right to exact from its subscribers this extra charge for Cincinnati service, because then the contract would remain binding as to other adjacent cities and it could not, as it may do now, exact additional fees for service to these cities, thus confining Newport subscribers to the limits of Newport unless they pay charges in excess of the contract rate.

The contract is, as I have said, free from ambiguity and uncertainty, but the court has taken a different view and treated the contract as so ambiguous and uncertain in respect to the point whether the company was obliged under its contract to furnish service to Cincinnati at the prices specified in its bid that I must extend this already long opinion in considering the effect of the practical and continuous construction of the contract by the telephone company.

The bid of the telephone company was accepted and performance of the contract commenced by it on November 8, 1909, and from that date until July 31, 1918, a period of about nine years, it continuously and without complaint or objection furnished to its patrons in Newport service for the prices specified in its bid in the surrounding territory and the adjacent cities, including Cincinnati. And it is impossible to believe that the telephone company would voluntarily, without charge, and as a matter of grace or accommodation, have furnished in the cities adjacent to Newport and the surrounding territory service under its bid unless it fully understood that its contract obligated it to do so.

This practical and continuous construction of the contract by the telephone company for the period named would, under all the authorities, establish that the contract, if uncertain or ambiguous, obliged it to furnish for the prices specified in its bid the service it did furnish. In support of this, I shall only cite three cases from the highest court in the land. In Lowber v. Bangs, 69 U. S. 768, 13 Law Ed. 768, the court said: "Contracts, where their meaning is not clear, are to be construed in the light of the circumstances surrounding the parties when they were made, and the practical interpretation which they by their conduct have given to the provisions in controversy."

In Brooklyn Life Insurance Co. .v. Dutcher, 95 U. S. 269, 24 Law Ed. 410, the same court said: "The practical interpretation of the agreement by parties to it is always considered of great weight. The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant than to see what they have done. Self interest stimulates the mind to activity, and sharpens its perspicacity. Parties in such cases often claim more but rarely less than they are entitled to."

In District of Columbia v. Gallaher, 124 U. S. 505, 31 Law Ed. 526, the same court said: "We think that the practical construction which the parties put upon the terms of their own contract and according to which the work was done must prevail over the literal meaning of the contract according to which the defendant seeks to obtain a deduction in the contract price."

On July 31, 1918, the United States government took over the control and operation of all the telephones in the country, and thereupon added to the rates specified in the contract between this company and the city of Newport an additional charge of 50 cents a month. In other words, the contract stipulated that the charge for residence purposes, direct line, should be $48.00 per year. The government added 50 cents a month, making the rate $54.00 a year. The contract stipulated a $30.00 rate for a two party line, and the government added 50 cents a month, making its rate $36.00. These extra rates continued until August 1, 1919, when the government returned the operation and conduct of the telephone systems to their owners, and when this return was made, the contract rates that had been suspended were restored to the status occupied before the government took control. Accordingly, on August 1, 1919, the extra charge put on by the government should have been taken off and the rates reduced to the contract price. But the company did not do this.

It attempted at first to continue the exaction of the additional rate demanded by the government, insisting, as shown by its pleadings, that it could not operate the lines without loss unless allowed to charge this extra rate. The lower court, however, enjoined it from charging the extra rate, and then, as appears from the record, it sent a written notice to all of its Newport subscribers setting forth that it could not, without loss, render the

service at its contract rates unless permitted to charge the 50 cents a month extra, and further said that unless it was permitted to charge this extra 50 cents a month, it would put on a toll charge of 10 cents on all calls made from Newport to Cincinnati.

It will thus be seen that this extra toll rate of 10 cents was purely an afterthought on the part of the company. Failing in its effort to continue the additional charge made by the government, it resorted to this unauthorized scheme to increase its revenue and has been sustained by this court in so doing.

The company has also sought to raise a federal question in this case, but there is no federal question involved. It is purely one of contract between two Kentucky corporations in which the telephone company in consideration of certain franchise rights granted it by the city of Newport agreed to furnish at specified rates to Newport subscribers service within a prescribed territory. The mere fact that this service extended into another state does not have the effect of converting this contract into a contract involving interstate commerce. The interstate commerce only arises between the Newport Telephone Company and the Cincinnati Telephone Company in the conduct of the business between the two companies, and does not affect the contract between the city and the telephone company.

I should further add that in the opinion, it is strongly intimated if not asserted that this telephone company is entitled to the relief sought on the authority of the case of the Rural Home Telephone Company v. Kentucky and Indiana Telephone Company, 128 Ky. 209, but this case has no bearing whatever on the question here involved. It was simply a controversy between the two telephone companies, one of them insisting that it had a contract with the other to furnish it service, while the other claimed that it was under no contract obligation to do so; that it had merely furnished the service as a matter of grace or accommodation; and it appearing to the court that this was true, we held that the company insisting on a continuance of the service had no contract with the other company, and, therefore, the other company might at its pleasure cancel the arrangement.

And so the Cincinnati company might at any time in the absence of a binding contract between it and the Newport company, refuse to furnish free service to the

Newport company, but its refusal to do so did not authorize the Newport company to violate its contract with the city, as the city was not a party to, and had no connection with, the contract or arrangement between these two companies.

In conclusion, I want to repeat that the contract obligated the telephone company to furnish Cincinnati service at the rates specified in the contract, and that there is not a section, sentence or word in the contract that justifies the decision of the court, and the judgment appealed from should be affirmed.