## Barker, President, et al. v. Crum, et al.

(Decided November 9, 1917.)

Appeal from Fayette Circuit Court.

1. Constitutional Law—Emoluments in Consideration of Public Services.—The separate emoluments or privileges which may be granted under section 3 of the Kentucky Bill of Rights to a person in consideration of public services, can be granted only when the person shall, by heroic deeds, inventive genius, or great mental endowments, and a life of public virtue, become, in the judgment of the legislature, a public benefactor.

2. Constitutional Law—Grant of Exclusive Privileges—Class Legislation.—Subsection 7 of section 4636a of the Kentucky Statutes, which grants to certain selected students the right to attend the State Universiy free from charges for tuition, matriculation fees, room rent, fuel and lights, and in certain cases to have their traveling expenses in going to and returning from the University paid by the state, violates section 3 of the Bill of Rights of Kentucky, which prohibits the granting of exclusive, separate public emoluments or privileges to any man or set of men, except in consideration of public services.

3. States—Contracts Between State and County—Statutes—State University.—The language of section 4636a providing that each county in the state in consideration of the income accruing to the State University from a tax levied by the legislature, shall be entitled to select and send certain students to the University each year free from all charges for tuition, matriculation fees, room rent, fuel and light, and to have their traveling expenses paid by the Commonwealth, does not constitute a contract between the state and the county.

4. States—Constitutional Law—Statutes.—Section 184 of the Kentucky constitution providing that the taxes imposed for the endowment and maintenance of the State University, as successor of the Agricultural and Mechanical College, shall remain until changed by law, did not recognize the validity of a statute then existing granting certain exclusive privileges to students attending the State University, said privileges being in violation of section 3 of the Kentucky Bill of Rights.

5.  Statutes—Constitutionality of.—The constitutionality of subsection 7 of section 4636a of the Kentucky Statutes providing that certain selected students may attend the State University free of charges for tuition and fees which other students are required to pay, cannot be sustained upon the ground that the students so selected constitute a class, because it does not treat all of the class alike, but grants to some of the class privileges which are denied to others of the same class.

6.  Statutes—Contemporaneous Construction.—It is the function and duty of the courts to interpret the meaning of a statute, and when they can ascertain the legislative intent by the use of intrinsic aids alone, resort to its contemporaneous construction by other persons is both unnecessary and improper. It is only where the language of the statute is ambiguous or uncertain, that the opinions entertained by contemporaries as to its meaning may be consulted.

M. M. LOGAN, Attorney General, and HENRY S. BARKER for appellants.

CHARLES CARROLL and T. C. CARROLL for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

This case was instituted by the appellant and tried upon an agreed statement of facts for the purpose of testing the right of the appellees, who are students in the State University, to attend that institution without paying tuition, matriculation fees, room rent, fuel and lights, or their traveling expenses in going to and returning from the university.

The right to so attend the university without paying these fees and expenses is claimed under section 7 of the Act of 1908, which is incorporated into the Kentucky Statutes as subsection 7 of section 4636a, and reads as follows:

"Each county in the state, in consideration of the incomes accruing to said institution, under the present laws for the benefit of the said Agricultural and Mechanical College, be entitled to select and send to said university each year one or more properly prepared students, as hereinafter provided for, free from all charges for tuition, matriculation fees, room rent, fuel and lights, and to have all the advantages and privileges of the said university, one white pupil for every three thousand, and one for each fraction thereof over fifteen hundred of white school children, based upon the last official census preceding said appointment: Provided, however, That every county shall be entitled to at least one annual ap-

pointment. Said students shall be entitled, free of any cost whatever, to the benefits enumerated above for the term of 'years necessary to complete the course of study in which he or she matriculates for graduation, or during good behavior. All beneficiaries of the state who continue students for one consecutive collegiate year, or ten months, unless unavoidably prevented, shall also be entitled to their necessary traveling expenses in going to and returning from said college. The selection of the beneficiaries shall be made by the superintendents of common schools in their respective counties, upon competitive examination, on subjects prepared by the faculty of the university and transmitted to said superintendents before the first day of June, each year. Said competitive examinations shall be open to all persons between the ages of fourteen and twenty-four years. Preference shall be given, other things being equal, to those who have passed with credit through the public school, persons of energy and industry, whose means are small, to aid whom in obtaining a good education, this provision is intended. Said competitive examination shall be held, and the successful compeititor appointed between the first day of June and the first day of August of each year. It shall be the duty of the county superintendent to make known the benefits of this provision to each common school district under his superintendency, with the time and place, when and where such competitive examination shall be held. He shall, for this purpose, appoint a board of examiners, whose duty it shall be to conduct the examination. This shall not interfere with any appointment already made to said college.''

It is conceded that the five appellees are students attending the State University; that each of them was selected from the county of his residence in the manner prescribed by the statute and has the qualifications and was appointed in the manner and upon the terms therein prescribed, and that he is entitled to attend said institution free of all charges for tuition, matriculation fees, room rent, fuel and lights and to have his necessary traveling expenses paid in going to and returning from said university, provided the statute above quoted is constitutional.

It is further agreed that the Agricultural and Mechanical College of Kentucky, the predecessor of the present State University, was established by an act of the General Assembly of Kentucky approved February

22, 1865, for the purpose of taking advantage of the act of Congress, approved July 2, 1862, and entitled "An act donating public land to the several states and territories which may provide colleges for the benefit of agricultural and mechanic arts." Fed. Sta. Ann. vol. 2, p. 850.

It is further stipulated that from 1865 to the present time students from the various counties in the state have attended, free of certain charges, and with certain rights and privileges, the college thus established by the state of Kentucky under the provisions of the statute of that year and subsequent acts of the General Assembly extending said college and consolidating it with other colleges, and that said students so attended by virtue of the general laws enacted by the General Assembly of Kentucky, giving them that right. Finally, it is agreed that a large number of students so attending the university studied branches taught therein other than those pertaining to agriculture and the mechanic arts.

The appellees contend that subsection 7 of section 4636a of the Kentucky Statutes, above quoted, is constitutional, (1) because it is the result of a contract between the state and the various counties thereof, that in consideration of the levying of a tax to support the college, certain selected students from each county can attend free of the charges in question; (2) because under section 184 of the constitution the General Assembly was given the power to establish a higher school of training than common schools, and it was also given discretion as to the manner in which it should be conducted, and who should attend it; (3) because the students appointed under the statute to attend the State University constitute a class to which section 3 of the Bill of Rights does not apply; and (4) that the statute will be upheld under the doctrine of contemporaneous construction.

On the other hand, the appellants—the officers of the State University—contend that all students attending the State University must be treated alike and placed upon the same footing with regard to charges for tuition fees, room rent, fuel and light and traveling expenses, and that to exempt the appellees, under the statute above quoted, would do violence to section 3 of the Bill of Rights of the constitution of Kentucky, which provides that "no grant of exclusive, separate public emoluments or privileges shall be made to any man, or set of men, except in consideration of public services."

The circuit court held the statute was constitutional; and, it accordingly entered a judgment directing the State University officers to receive the defendants as students and to provide them with tuition, room rent, fuel and light, and traveling expenses, free of charge. From that judgment the defendants prosecute this appeal.

The circuit judge stated the reasons for the conclusions reached by him in a written opinion in which he concedes that the enjoyment of these advantages by the students without paying therefor is a privilege, or emolument, which is not enjoyed by other students at the university; that the appellees have not and are not now rendering any service to the state of Kentucky which would entitle them to any such special privileges; that if the granting of such rights is to be upheld it must be upon some ground other than that of services rendered by the students, who receive the bounties; and that if the case shall be decided solely upon the rule and principle as laid down in section 3 of the Bill of Rights, *supra,* it must be adjudged that the appellees are not entitled to the privileges in question.

The opinion of the circuit judge stated more than once that the claim of the appellees could not be sustained under section 3 of the Bill of Rights alone; that it could only be sustained upon the principle that there is an obligation upon the part of the state to aid in the education of its citizens; and that the statute under which the university is supported and the appellees are receiving special privileges can only be upheld upon the idea that the state is justified in taxing all of its citizens for the purpose of giving a select few instruction in the higher branches of a college education.

The circuit court further gave some effect to section 184 of the constitution, which provides for the preservation of the common school fund of the state, as follows:

"The tax now imposed for educational purposes, and for the endowment and maintenance of the Agricultural and Mechanical College, shall remain until changed by law."

And, stress was laid upon the fact that when the present constitution containing section 184, *supra,* was adopted certain statutes for the maintenance of the Agricultural and Mechanical College, the predecessor of the State University, and carrying some of the privileges now claimed by the appellees, were upon the statute book, and their provisions presumably were well known

to the members of the constitutional convention and possibly to the voters who approved the constitution.

In this way the circuit court applied the rule of contemporaneous construction and held that although the exemptions constituted special privileges and emoluments denounced by the Bill of Rights, in view of the fact that they had been recognized for many years by the legislature and the state officers in disbursing funds under the act, it must be treated as valid.

We cannot agree with the conclusions reached by the circuit court. If the statute relied on grants any exclusive privileges to these students it is to that extent in direct violation of section 3 of the Bill of Rights, and cannot be upheld, upon any ground, if the constitution is to remain the paramount law of this Commonwealth.

The constitution is the organic law by which the people, among other things, have put certain clearly expressed limitations upon the power of the legislature. It is the embodied will of the people by which they govern their governors. If the legislature may ignore or explain away a provision of the constitution in order that some conceded or fancied good may be accomplished in individual cases, then section 3 of the Bill of Rights was adopted in vain.

The constitutional declaration against the granting of special privileges to any man or set of men, states the sweeping prohibition and the only exception thereto. They can be granted to no one, except in consideration of public services theretofore rendered.

It is immaterial who the man is, or where the set of men reside, or how they are distributed throughout the state; unless they earn them in the manner pointed out in the constitution, to-wit, by the rendition of public services, they are prohibited. The statute under consideration can, therefore, be sustained only upon the theory that these students have rendered such public service as would entitle them to something more at the hands of the state than the thousands of other worthy girls and boys in precisely the same situation. But they make no such claim, and cannot truthfully do so. It would seem, therefore, that the case against them stands confessed and that it is unnecessary to define the terms "public emoluments or privileges," or "public services," as used in the Bill of Rights.

The prohibitory words are so elementary as to need no explanation or definition. If the privilege granted is not conferred on all alike it is special or exclusive, and

therefore prohibited unless granted in consideration of services theretofore rendered to the state.

There is some difficulty in defining "public services" as here used, with a satisfactory degree of precision. However, we are not without authority directly in point. In 1865, the legislature passed an act authorizing the county courts of Boone and Gallatin counties, respectively, to issue county bonds for the purpose of raising and paying money in procuring volunteers and substitutes in the place of men drafted in those counties for service in the army of the United States. The constitutionality of these statutes was before this court in Ferguson v. Landram, 1 Bush 548, and in holding the statute unconstitutional Chief Justice Peters and Judges Robertson and Williams wrote separate opinions. In the opinion by Judge Williams he defined separate emoluments and privileges as follows:

"Nor can such tax be imposed by virtue of section 1, Bill of Rights, in our state constitution, because the 'separate emoluments or privileges' therein named is not for contemplated service to be rendered, but is allowed when the person shall, by heroic deeds, inventive genius, or great mental endowments, and a life of public virtue, become, in the judgment of the legislature, a public benefactor."

This definition was approved by this court in Bosworth v. Harp, 154 Ky. 549, in an opinion sustaining the Confederate pension statute. That statute was sustained only upon the ground that the Confederate soldiers of Kentucky had rendered such public services to the state as would uphold the grant of a pension.

But, as heretofore stated, the appellees do not contend that they have rendered any such public services as would entitle them to the special privilege of having their tuition, room rent, fuel and light, and traveling expenses paid out of the public treasury, while other students, equally as worthy, are required to pay for those privileges out of their individual funds. It would seem that the inevitable conclusion must follow, that the statute is a manifest violation of the constitution.

Appellees, however, urge four propositions in support of the constitutionality of the act. We will examine them briefly. The first contention is that the act should be sustained because it was the result of a contract between the state and the various counties thereof, that in consideration of the levy of a tax to support the uni-

versity, certain selected students of each county could attend it free of these charges. This proposition is not supported by any authority and in our opinion is wholly untenable. This argument is based upon the language of the statute which recites that "each county in the state, in consideration of the incomes accruing to said institution" shall be entitled to select a specified number of pupils to attend the university free of the charges therein specified. We have not, however, been referred to any facts existing between the state and the counties which constitute a contract that could be binding upon either the state or the counties. And, indeed, there is no claim that any formal contract was made or attempted. The state levies taxes upon all the people of the state and without the consent of the counties. We fail to find a single element of contract either binding upon the state or otherwise, and the mere recital in the statute that the counties may send pupils to the university in consideration of taxes levied by the state and paid by the counties did not constitute a contract of any kind. It is a mere legislative avowal, not a contract.

Furthermore, the constitution of 1850 contained substantially the same prohibition against special privileges; and, if the statute of 1865, or any subsequent statute, attempted to create the contract claimed by appellees, it violated the constitution of 1850.

Appellees' next contention is that the statute is constitutional because under section 184 of the constitution the General Assembly was given power to establish a higher school of training than the common school, and it was also therein given discretion as to the manner in which it should be conducted, and who should attend it. Section 184 of the constitution in so far as it relates to the subject in hand reads as follows:

"No sum shall be raised or collected for education other than in common schools until the question of taxation is submitted to the legal voters, and the majority of the votes cast at said election shall be in favor of such taxation: Provided, the tax now imposed for educational purposes, and for the endowment and maintenance of the Agricultural and Mechanical College, shall remain until changed by law."

It is true the power of the legislature to create the State University has been directly and indirectly recognized by this court. See Higgins v. Prater, 91 Ky. 6; A. & M. College v. Hager, 121 Ky. 1; Marsee v. Hager,

State Auditor, 125 Ky. 445; James, Auditor v. State University, 131 Ky. 156. But section 184, *supra*, is in no way in conflict with section 3 of the Bill of Rights. It merely declares that the tax then levied for the endowment and maintenance of the Agricultural and Mechanical College (the predecessor of the State University) should remain until changed by law. It made no declaration as to the expenditure of the money so raised.

It is not concerning the collection of the taxes that appellants are complaining. On the contrary, they doubtless favor the continuance of the tax for the endowment and maintenance of the university, but they are opposed to the use of the taxes thus collected for the purpose of endowing certain students rather than the university. As we read it, section 184 of the constitution has no application to the question before us, which relates to the apportionment and application of the tax and not to its exaction.

Thirdly, the appellees would sustain the constitutionality of the statute upon the ground that the students appointed under the statute constitute a class, and that section 3 of the Bill of Rights does not apply for that reason. In support of this contention they cite Owen County Tobacco Society v. Brumback, 128 Ky. 127, and Louisville Railway Co. v. Louisville Fire & Life Protective Association, 151 Ky. 644. It is true that the statute in question creates a class, but it does not treat all of that class alike; and its vice is found in that omission. If the statute had provided that all students of a certain age who pass the required examination should be entitled to enter the university upon equal terms and conditions as to the payment of fees and other expenses, it might be said that the statute was unobjectionable. But here there is no such provision since the class is first selected under an examination and from that class another class is selected by the county superintendent, and the fortunate students thus arbitrarily selected are given money from the state treasury where others who have likewise passed the required examination are required to pay their fees and traveling expenses. The cases relied upon have no application.

In Dawson v. Lee, 83 Ky. 49, it was attempted to sustain the constitutionality of an act establishing a uniform system of schools for the colored children of the state, which, by implication, excluded the negro children from any participation in the privileges of the common

school fund set apart by the constitution. In holding this act unconstitutional this court said "that state taxes for purposes of education shoud be provided for by general laws applicable to all classes and races alike, and that all the children of the state are entitled to an equal share of the proceeds of the 'common school fund,' and of all state taxation for purposes of education." The same general principle of equality in the participation of the school fund was announced in Underwood v. Wood, 93 Ky. 181, 15 L. R. A. 825.

Finally, it is contended that the statute should be sustained under the doctrine of contemporaneous construction; and, in support of this proposition appellees rely upon Clark's Run and Salt River Turnpike Road Co. v. Commonwealth, 96 Ky. 525, and A. & M. College v. Hager, Auditor, 121 Ky. 1.

As we understand the doctrine of contemporaneous construction as applied in the cases cited, it means that in the interpretation of a statute ambiguous in meaning, the contemporaneous and long continued construction placed upon it by those that have been called upon to carry it into effect, is entitled to great respect in ascertaining the meaning of the statute. The rule is stated as follows in 36 Cyc. 1139:

"Primarily it is the function and duty of the courts to interpret the meaning of a statute, and where they can ascertain the legislative intent by the use of intrinsic aids alone, resort to its contemporaneous construction by other persons is both unnecessary and improper. But where the language of the statute itself is ambiguous or uncertain, the opinions entertained by contemporaries as to its meaning are frequently the best guides to the legislative intent.

"On the principle of contemporaneous exposition, common usage and practice under the statute, or a course of conduct indicating a particular understanding of it, will frequently be of great value in determining its real meaning, especially where such usage has been acquiesced in by all parties concerned, and has been extended over a long period of time. But no matter how long the usage has been established, or how general the acquiescence in the customary construction, it will not be permitted to vary or to defeat the real intention of the legislature as expressed in the statute and interpreted by the court." Nichols v. Wells, Sneed's Pr. Dec. 255; City of Louisville v. Louisville School Board, 119 Ky.

574; City of Louisville v. Louisville Water Co., 105 Ky. 754; Commonwealth v. Ross, 135 Ky. 315; Commonwealth v. Kentucky Distilleries and Warehouse Co., 143 Ky. 314; and City of Louisville v. Board of Education, 154 Ky. 319, are to the same effect.

But in this case neither the statute nor the constitution is of doubtful meaning. Moreover, when a statute conflicts with a plain provision of the constitution the rule of contemporaneous construction is not applicable; otherwise it would mean that a violation of the constitution would be upheld providing it had continued long enough to give it dignity. The statute which violates the constitution is never effective for any purpose; it can not be made constitutional by repeated violations of that instrument. This precise question was before this court in City of Louisville v. Vreeland, 140 Ky. 401, where it was attempted to sustain an unconstitutional act providing for the appointment of a gas inspector, upon the ground that it had been in operation for more than fifteen years and that the city had paid out $3,000.00 each year as salary for the inspector.

In answer to that argument the court said:

"No effect can be given the fact that since 1892 gas inspectors have been appointed for the city and have been paid $3,000.00 a year. Contemporaneous construction by the city authorities cannot override a mandatory provision of the constitution of the state, which is expressed in no uncertain language, and has been several times construed by this court."

The reasons for this strict rule in the construction of constitutions are well stated in Lieber's excellent and interesting work entitled "*Hermeneutics*" (Hammond's ed.), p. 174, as follows:

"Constitutions should, in ordinary cases, be construed closely, because their words have been well weighed, and because they form the great contract or agreement, between the people at large, or between the people and their ruling race. . . .

"As we may interpret a will with greater freedom than a contract, and a contract, if it relates to a few who concede, more comprehensively than a law which has general effect, so we may construe a law with more freedom (provided no party be injured thereby) than a constitution; for the latter contains the most general rules applying to all. It is calculated for relations in which every one has a common interest; and as the interests

common to all in a large community must be less in number than those which may be equally shared between a few persons, a strict adherence to the constitution is necessary to maintain the universality of its application and secure uniformity in its effect.'' See also 167 Ky. 796, where it was said that the rule of contemporaneous construction applied only to statutes; and not to the mandatory provisions of the constitution.

We conclude, therefore, that neither of the grounds relied upon is maintainable and that so much of subsection 7 of section 4636a of the Kentucky Statutes as exempts the appellees from paying matriculation and tuition fees, room rent, fuel and light and traveling expenses violates section 3 of the Bill of Rights, and is void.

Provisions substantially identical with section 3 of our present Bill of Rights have been incorporated into all the previous constitutions of Kentucky, and the conclusions here reached is re-enforced by a notable legislative incident in the early history of the state in connection with the pension of $300.00 per year granted to Chief Justice George Muter, in 1806.

It was the first pension to a retired judge ever granted in the United States. *Baldwin's ''American Judiciary,''* p. 326. And the earliest discussion upon the subject, of which we now have a record, is found in the legislative proceedings in connection with the repeal of that statute, in 1809. At that time there seems to have been quite a difference of opinion as to the meaning of the words ''public service'' as used in the Bill of Rights, and the prevailing opinion was radically different from our modern ideas upon the subject.

The facts were of so striking a nature as to bring the case sharply to the attention of the public, as well as to the legislature, and presented a most meritorious case for an application of the constitutional exception, as we now understand it.

George Muter was chief justice of the Kentucky Court of Appeals from 1792 to 1806. He was a Scotchman, and had grown old in the military and judicial services of Virginia and Kentucky. By 1806 he had practically become incapacitated from performing his duties as chief justice; but on account of his exalted character and distinguished public services, the legislature of that year appointed a committee to call upon Judge Muter and to know of him if he would resign, expressing a high sense of his past services, and declaring that a com-

fortable subsistence, in case of his resignation, ought to be provided for him by a generous people.

At the same time the committee presented to Judge Muter a resolution of respect adopted by the House of Representatives, reading as follows:

"Resolved, That those who have devoted the best part of their lives to the public service, and from age and infirmity have become unable to discharge the important duties assigned them, with requisite ability and dispatch, or to procure for themselves a comfortable subsistence, ought to be provided for by a generous people; Whereas, it appears to this legislature that the honorable George Muter, esq., chief justice of this commonwealth, is a person of this description, and for whom such provision should be made, if he would gratify the wishes of his country, by resigning the important office he now holds; but in order to prevent any misapprehension of their views or sentiments on this subject, and in justice to their own feelings, the legislature deem it their sacred and indispensable duty to declare they entertain a very high sense of his integrity and attachment to liberty and his country, and they recollect with gratitude his patriotic exertions in our revolutionary contest. And they beg leave further to assure him, that neither this, nor any measure that has taken place, or been attempted during the present session, has been dictated by any design or wish to cast odium or censure upon his character; but every measure has been and will be the result of sincere desire to promote the happiness and welfare of their constituents.

"Resolved, That a committee be appointed to wait on the honorable George Muter, with the foregoing resolution."

In replying to the committee, Judge Muter said:

"Gentlemen, my country first called me into her service; I will retire when she no longer needs my services. I will make no agreement as to any particular sum for resigning my office. Let the proceedings which have already been or may be spread on the journals of the house on this subject be erased, and I promise you to resign, trusting to the justice and generosity of the legislature to make what provision for my support they may think right."

The proceedings relating to the resolution were erased; Judge Muter resigned his office of chief justice of this court; and the legislature promptly passed the act of December 22, 1806, providing him with a modest

pension as above indicated, the preamble reciting the facts relating to his distinguished services to the state, his resignation, his age and infirmity, and his poverty. Acts 1806, p. 363.

Notwithstanding all this, in 1809, the legislature repealed the pension act of 1806, over the objections of the Governor; and it is from the veto message of Governor Scott that we glean the prevailing view of that day (in which he did not concur) as to the meaning of the words "public service."

In the course of his veto message, Governor Scott, who disclaimed being a lawyer, stated the case as follows:

"But it may be objected, that the expression public service, in the constitution means only a compensation or salary for services, to be given to a public officer, while performing the duties of his office.

"It turns then, not upon any precise and absolute prohibition, but upon a mere point of construction. But if the constitution intended to prohibit the legislature from giving a shilling to the most illustrious citizen, who should have sacrificed his all in the service of his country, beyond the ordinary pay allowed, to one who had the same duty assigned to him, and who had barely escaped censure; if it had intended to cut up by the roots, national generosity, and national bounty, to one who may have saved the state by his extraordinary exertions; if it told the legislature, you shall not give to the disabled soldier, who has lost his limbs in the battles of his country, a cent or an inch of ground, after he has received the ordinary pay, but he shall return and trust to ordinary charity, or have the privilege to die in poverty at home; if it has declared, that in case he falls, you shall extend no relief, as a public body, to his widow and orphan children; if it has told you, in short, that it was intended to exclude from our government what it should possess above any other on earth, the disposition and means of rewarding merit, I have not been able to find it in language intelligible to my mind, or so clear as to convince me, that the framers of the constitution intended to outrage human feeling, and prostrate the strongest motives to public service. For a belief that our country will take care of our best interests, makes the soldier and the patriot. Far different is the conclusion which I have drawn from this section of the constitution. Taking it altogether, which appears to be the better way to understand it, while it is abolishing those exclusive privi-

leges, which are attached to nobility and titles, as well as proscribing the abominable practice of pensioning favorites, who have deserved nothing of their country; all of which prevail in kingly governments; the only order retained is that of merit, and the only claim to public emoluments is public service,-but it has opened the road to public honor, emolument, and privilege, to all who may deserve them.

"Illusive, indeed, would be the invitation of the state to her citizens to persevere in devoting themselves at every hazard to her service if she has told the legislature that a man who has spent the prime of his life in her service, in both civil and military capacity, who is called upon in consequence of his age and infirmity, for public good, to resign, because he has not retained all the intellect and vigor of youth—because the office found him poor, and he has not enriched himself by speculating whilst a judge; and is now too poor to support himself, he shall be abandoned to die in want, or charitably be provided for amongst other beggars of a county.

"But the general sense of the people of this country, and many practical expositions of the legislature, are opposed to this construction of the constitution; however, some of them, from correct motives, no doubt, and principally from not having understood the circumstances of this case, may desire a repeal of this law. For if the legislature have a right to give by law ten dollars to a man for public service, which has already been when that sum was not a part of the proposed or stipulated compensation, they have a right to give three hundred, and they have as much right, in my apprehension, to give it for twenty years, or during life, as for one year. Giving land for public services already performed, must be as much prohibited as money; it is an emolument. And I beg leave to refer you to the objections made by my predecessor to a bill similar to this, during the last session, for a list of unconstitutional laws, if this be one.

"If, indeed, the principle be correct, that the service having been rendered takes it out of the power of the legislature to grant any compensation for it, or to add to that which has been granted, scarce a session has elapsed, but an unconstitutional law has been passed." Sen. Jour. 1808-9, p. 150.

The repealing statute passed in the House of Representatives, notwithstanding the veto, by a vote of 56 to 11, and in the Senate by a vote of 17 to 10.

From this narrative it will be seen that a century ago the opinion prevailed, that emoluments in consideration of "public services" as used in the Bill of Rights, meant only compensation or salary for a public officer while performing the duties of his office; and the services having been rendered and paid for, the power of the legislature to grant any compensation by way of pension, or otherwise, or to add to that which had been granted, no longer existed. And, it must not be overlooked that the pension act of 1806 was repealed, after Governor Scott had called the legislature's attention to the fact that it partook of the nature of a contract.

While we do not say that the words "public services," as used in the present Bill of Rights, should be given the narrow meaning attributed to them by the legislature a century ago, that action is at least interesting and instructive, particularly in view of the scarcity of precedents upon the subject.

There is also a line of cases decided under constitutional provisions similar to section 184 of our constitution and dealing with attempted appropriations of the state school fund to purposes which bear more or less resemblance to educational purposes, and which have been held invalid because they violate section 184 of the constitution. See also section 180, Kentucky Constitution, prohibiting taxes collected for one purpose from being devoted to any other purpose. Underwood v. Wood, *supra;* Halbert v. Sparks, 9 Bush 259; Auditor v. Holland, 14 Bush 147; Collins v. Henderson, 11 Bush 74; Williamstown Graded Free School District v. Webb, &c., 89 Ky. 265; Board of Education v. Board of Trustees of Public Library, 113 Ky. 243; Board of Trustees of Public Library v. Board of Education, 25 Ky. L. R. 341, 75 S. W. 225, are illustrative cases upon this subject.

There is also another line of cases holding that statutes of the character of subsection 7 of section 4636a violate the constitutional requirement that taxes shall be levied and collected for public purposes only, and that this constitutional provision applies to an appropriation of taxes as well as to their collection. See section 171, Kentucky Constitution. State v. Switzler, 143 Mo. 287, 40 L. R. A. 280, 65 Am. St. Rep. 653, is directly in point. In that case it was held that the maintenance of a state university established by the state constitution was a public purpose, but that the maintenance of free scholarships therein for the support of those students who were dependent upon their own exertions for their education

and were financially unable to obtain it otherwise, and who should pass the most meritorious examinations, constituted a use of public funds, for private purposes, and a statute appropriating public moneys therefor violated the Missouri constitution prohibiting grants in aid of any individual. To the same general effect see Kingman v. Brockton, 153 Mass. 255, 11 L. R. A. 123; People's Detroit & H. R. Co. v. Salem Township Board, 20 Mich. 452, 4 Am. Rep. 400; Citizens Saving and Loan Assn. v. Topeka, 20 Wall. 655; Allen v. Jay, 60 Maine 124, 11 Am. Rep. 185; Fieldman v. Charleston, 23 S. C. 57, 55 Am. Rep. 6; Lowell v. Boston, 111 Mass. 454, 15 Am. Rep. 39; Curtis v. Whipple, 24 Wis. 350, 1 Am. Rep. 187, and Deal v. Mississippi County, 107 Mo. 464, 14 L. R. A. 622.

In each of these cases it was held that the fact that the state might be incidentally benefited by rebuilding a burned city, the establishment of manufactories, schools, libraries, etc., would not sustain the tax; and that the indirect good which arises in this way furnishes no basis for taxing other businesses and people to build up such occupations.

But, since these features of the case were not raised or discussed in the argument we pass them without further discussion, and without deciding them, and rest our decision upon the point that the statute in question violates section 3 of the Bill of Rights, in that it confers special privileges and emoluments to the appellees who have rendered no public service within the meaning of that section of the constitution.

Judgment reversed and action remanded with instructions to the circuit court to set aside the judgment appealed from and to enter a judgment denying the appellees the privileges awarded to them by the judgment of the circuit court.

The whole court sitting; Judge Sampson dissenting.