### City of Covington v. State Tax Commission et al.

(Decided November 22, 1929.)

HARRY D. KREMER for appellant City of Covington.

ROUSE & PRICE for appellee Covington & Cincinnati Bridge Co.

J. W. CAMMACK, Attorney General, for appellee State Tax Commission.

GALVIN & TRACY for appellees C. & O. R. R. Co. and Covington & Cincinnati Elev. R. R. & Transfer & Bridge Co.

MORRIS & JONES for appellee C. & O. Ry. Co.

OPINION OF THE COURT BY CHIEF JUSTICE THOMAS— Reversing.

The first case in the caption was designated in the court below, and is referred to on this appeal, as case No. 33019, while the second one was designated in the same court and referred to in this one as No. 33020. Each of them was filed in the Franklin circuit court against the

state tax commission and its members, and against the owners and operators of two bridges spanning the Ohio river between Covington, Ky., and Cincinnati, Ohio; the one in the first case in the caption (No. 33019) being exclusively a railroad bridge.

The relief sought by plaintiff in each of them was a writ of mandamus ordering, directing, and requiring the state tax commission to certify to the proper authorities of the city of Covington the assessed value of the mileage of each bridge, including its franchise valuation for taxing purposes, which plaintiff alleged in its petitions was that portion of the properties between low-water mark on the south, or Kentucky, side of the Ohio river, and low-water mark on the opposite Ohio shore of the river, upon the theory that the northern corporate boundary of the city of Covington extended to the northern line of the state, which is low-water mark on the northern shore of that river. But, if mistaken in that contention, then plaintiff alleged in its petitions that the corporate limits of the city of Covington in any event extended to the thread of the stream of the Ohio river, and that it was entitled to collect taxes on the aforesaid valuations of the involved bridges, or so much of each as was located between low-water mark on the south side of the river and the thread of the stream.

Defendants in each case denied plaintiff's right to the relief it sought upon the ground that the northern boundary of the city of Covington was located at low-water mark on the south shore of the Ohio river, and that each of the bridges had paid to plaintiff, the taxes due it pursuant to certifications made by the state tax commission, on the assessed valuation of the bridge properties up to low-water mark on the south shore of the Ohio river. There was also a plea of res adjudicata made by the Chesapeake & Ohio Railway Company in case 33019, which consisted of a judgment rendered by the Kenton circuit court on May 22, 1928, in an action theretofore filed in that court on May 16, 1914, by one John Kleyman as delinquent tax collector of the city, and which he styled "City of Covington v. Covington Elevated Railroad and Transfer Bridge Company," by which he sought a judgment, assessing the physical and franchise valuations of the bridge company for municipal taxes, and for a judgment for the amount of taxes due upon such assessment when made. That petition was amended from time to time so as to include all the years

not barred by the statute of limitations up to and including the year 1925. The same defense, that the property sought to be assessed therein was not located in the corporate boundary of the city of Covington, was therein made, but not until a special and general demurrer to the petition was filed by defendant and overruled by the court.

On the day the judgment was rendered therein (February 14, 1927) the court set aside its orders theretofore made in that case, overruling the special and general demurrers, and sustained each of them, and dismissed the petition, and which latter order was done upon the ground that the circuit court was without jurisdiction to grant the relief prayed for, because the exclusive authority to assess such property for state, county, and municipal taxation rested in the state board of tax commissioners since its creation, and by its predecessor state agency for that purpose prior to its creation. More than a year later, and on May 22, 1928, after that petition had been so dismissed, the parties thereto appeared in the same court, and by consent filed a paper denominated "A substituted petition" in lieu of the original petition filed in 1914 and the various amendments thereto, and in which all such original pleadings were withdrawn from the case. Such substituted petition purported to be an action under what is known as our "Declaratory Judgments Statute" (Civil Code of Practice, secs. 639a1 to 639a12), but it was filed by the same delinquent tax collector for the city of Covington. In it the sole question submitted for determination was the true location of the north boundary of the city of Covington.

On the same day the substituted petition was filed in that case, an answer was filed by the defendants therein, in which the same question was submitted for the court's determination, and on the same day, without the taking of any proof except what had been taken in the original cause before such substitution was made, the matters presented by the substituted petition were submitted to the court and it rendered this judgment: "This cause being submitted for judgment, it is adjudged, that the plaintiff's petition as amended be and it is now dismissed, to all of which the plaintiff excepts and prays an appeal to the Court of Appeals which is granted." The efficacy of that judgment in support of the res adjudicata defense interposed in case No. 33019 will hereafter be considered. Learned counsel for defendants

in the other case also relied on a res adjudicata plea which was bottomed on his interpretation of this Court's opinion in the case of Kennedy's Heirs v. Covington, 8 Dana 50, his client succeeding to the rights of Kennedy's heirs, and which case will be referred to hereinafter and discussed and construed as not supporting the plea. Following pleadings in the instant cases made the issues, and, upon final submission, the court adjudged that the northern corporate limits of the city of Covington extended only to low-water mark on the Kentucky shore of the Ohio river, and therefore dismissed the petition in each of them, and from those judgments plaintiff in each of them prosecutes these appeals.

It will at once be seen that the decisive question in each of these appeals (putting aside for the moment the res adjudicata defenses) is: Where is the true location of the northern boundary of the city of Covington? and which we regard as being one of mixed law and fact, and involves the construction of certain deeds and enactments of the General Assembly of Kentucky directly bearing thereon. The town of Covington (subsequently changed to "The City of Covington") was first incorporated by act of the General Assembly of Kentucky approved February 8, 1815, and by that act it was established: "On the land lately purchased by Thomas Kennedy, by Richard M. Gano, Thomas D. Carneal and John S. Gano, situated at the mouth of the Licking river, on the lower side thereof," and which territory at that time was a part of Campbell county, Ky., Kenton county being later carved therefrom. The "land lately purchased of Thomas Kennedy" upon which the General Assembly established the town of Covington consisted of 150 acres, and was purchased by Kennedy from James Welch on December 9, 1801, the description of which, as contained in the deed, so far as pertinent to the question now involved, says: "Beginning at a Beech and Honey Locust; thence south down the Ohio, eighty-four degrees west, seventy-four poles, south seventy-one degrees west, ninety-four poles, south sixty degrees west sixty poles, south eighty-two degrees west, ninety-two poles, to Beech and Hopwood on the river bank."

Kennedy later sold and conveyed the land to Gano, Carneal, and Gano, and in which conveyance he described the tract as "lying and being in the county of Campbell and state of Kentucky at the junction of the Licking and Ohio rivers on the lower side of the Licking river, con-

sisting of the land conveyed by James Welch to said Thomas Kennedy by deed recorded in Campbell county aforesaid, dated 9th day of December, 1801,'' except 50 acres theretofore conveyed by Kennedy to one Joel Craig, and which conveyance was made to the grantees as a town site upon which they later located the town of Covington. In 1841 and in 1849 the corporate limits of the then city of Covington, which in the meantime had annexed the town of West Covington, were extended by special acts of the Legislature down the Ohio river, and which it had the authority to so do under the then Constitution of the state.

The first extending act said: ''Commencing on the Ohio river at the western corporation line; thence down said river to the west side of Main street,'' etc.; while the language of the second extending act read: ''Beginning on the Ohio river at the western corporation line, the foot of Main street, thence down said river, to a point where a line drawn parallel to and four hundred feet west of the principal part of Wright Street, in Ludlow's subdivision, will intersect.'' Both of such annexations were located west of the original incorporated town of West Covington, but which in the meantime had become annexed to the city of Covington. The act incorporating West Covington read: ''Beginning on the Ohio river at the limits of the western corporation line of the city of Covington,'' thence southwardly with the west line of the city of Covington around to the eastern boundary of the town of Ludlow; ''thence northwardly with said eastern boundary line to the Ohio river; thence with the Ohio river to the place of beginning.'' The first question, therefore, is: What is the legal effect of such descriptions where they are bounded by and run up or down the Ohio river?

At the common law private owners of land whose deeds called for a line with physical dimensions, such as a road, a street, a stream, or water course, having both length and width, nothing appearing in the deed to the contrary, owned by construction or presumption to the center of such physical line or thread of the stream, except where the boundary was a stream in which the tide ebbed and flowed, in which case the grantee took title only to high-water mark of such stream. If the bounding stream was not tide water, although actually navigable, under that rule the riparian individual owner, by such presumption or construction, took title to the thread

of the stream. See 4 R. C. L. p. 78, sec. 7, as it relates to boundaries of highways and streets, and volume 27 of same publication, p. 1362, sec. 272, as it relates to non-tidal, although navigable, waters; 13 Cyc. p. 629, 9 C. J. 185, sec. 61, as it relates to water boundaries of nontidal streams, and same book page 195, sec. 83, as it relates to boundaries by streets and highways; but which rule as to the latter boundary is confined to cases where the public has not acquired title to the street or highway. Jennings v. Marston, 121 Va. 79, 92 S. E. 821, 7 A. L. R. 855; Stewart v. Turney, 237 N. Y. 117, 142 N. E. 437, 31 A. L. R. 960; In re City of New York (In re Parkway in City of New York), 209 N. Y. 344, 103 N. E. 508, 2 A. L. R. 1, and annotations to the case in the last publication; City of Nashville v. Lawrence, 153 Tenn. 606, 284 S. W. 882, 47 A. L. R. 1266.

An almost unlimited number of text authorities, and opinions of foreign courts to the same effect could be cited, but we deem is unnecessary, since it appears to be almost of universal application as to its general terms, in the absence of something indicating a contrary purpose and intention on the part of the grantor wheresoever he holds title to the center of the boundary, whether it be a street, highway, or a non-tidal stream, and which rule we have adopted in a number of cases and without exception. Some of them in which the rule was adopted where streets and highways constituted the boundary are: Hawesville v. Lander, 8 Bush, 679; Schneider v. Jacob, 86 Ky. 101, 5 S. W. 350, 9 Ky. Law Rep. 382; Jacob v. Woolfolk, 90 Ky. 424, 14 S. W. 415, 12 Ky. Law Rep. 400; 9 A. L. R. 551; Coppin v. Manson, 144 Ky. 634, 139 S. W. 860; Williams v. Johnson, 149 Ky. 409, 149 S. W. 821; Blalock v. Atwood, 154 Ky. 394, 157 S. W. 694, 46 L. R. A. (N. S.) 3; and Henry v. Board of Trustees of Diocese of Kentucky, 207 Ky. 846, 270 S. W. 476, and others cited in those opinions.

As to the rule when a stream is the boundary this court has adopted and applied it in the cases of Berry v. Snyder, 3 Bush, 266, 96 Am. Dec. 219; Miller v. Hepburn, 8 Bush, 326; Williamsburg Boom Co. v. Smith, 84 Ky. 372, 1 S. W. 765, 8 Ky. Law Rep. 369; Kentucky Lumber Co. v. Green, 87 Ky. 257, 8 S. W. 439, 10 Ky. Law Rep. 139; Runion v. Alley, 39 S. W. 849, 19 Ky. Law Rep. 268; Robinson v. Wells, 142 Ky. 800, 135 S. W. 317; Caughlin v. Wilson, 167 Ky. 35, 180 S. W. 40; Stonestreet v. Jacobs, 118 Ky. 745, 82 S. W. 363, 364, 1012, 26 Ky. Law Rep.

628, 1015; Bedford-Nugent Co. v. Herndon, 196 Ky. 477, 244 S. W. 908; Ware v. Hager, 126 Ky. 324, 103 S. W. 283, 31 Ky. Law Rep. 728; McGill v. Thrasher et al., 221 Ky. 789, 299 S. W. 995, and numerous others cited in those opinions. In passing, it might be here stated that in the case of Ware v. Hager, supra, and others referred to therein, this court held that riparian owners abutting on the Ohio river, by virtue of the rule under consideration, did not acquire title to low-water mark on the northern shore of that river, notwithstanding the northern boundary of the state of Kentucky extended to that line, but that such riparian owners took title under the rule to only the thread of that stream.

It was also held in the Stonestreet case, and some others of the cited ones, that: "The mere mention of a monument on the bank of a stream as the place of beginning or end of a line is not of itself sufficient to control the ordinary presumption that the grantee will hold to the thread of the stream," but that, where it was the evident intention and purpose of the grantor to convey the land to the stream itself, it would carry title to the grantee, under the rule, to the thread of the stream, notwithstanding the mention of monuments on its bank as a place of beginning or ending of that line. To the same effect as the Stonestreet case see Reichert v. Ellis Ferry Co., 184 Ky. 150, 211 S. W. 403, where trees and monuments on the bank of the river were called for in the river line descriptions, and this court held that it was the intention and purpose of the grantor (there being nothing in the deed to the contrary) to convey to the full extent of his title, i. e., to the thread of the stream.

It is therefore apparent that, under the description of the deeds to the land upon which the town of Covington was originally located, and the act of the Legislature incorporating it, the Ohio river was made the northern boundary, and that under the deed from Welch to Kennedy the latter took title to the thread of that river. It is also clear that, under the descriptions of the northern boundary of the city of Covington as contained in the special acts of the Legislature extending its corporate limits, supra, if they had been contained in a private conveyance, the riparian vendee would have taken title to the thread of the river, since it is manifest from such descriptions that the Ohio river was made the northern boundary.

614

But, if there existed a doubt as to the river boundary in the description of the Welch deed to Kennedy, being sufficient to carry it to the Ohio river, so as to make that stream the northern boundary, then we would be bound by the construction of that deed by this court in the case of Kennedy's Heirs v. Covington, supra, in which the direct question was involved. In the deed to Gano and others trustees, there was reserved to the grantor the exclusive ferry privileges across the river from the town to be established. There was also a plat showing the marking of streets and lots, and a space for a common between the last tier of lots and the top of the bank of the river; but there was no indicated dedication on the plat of the bank of the river between the top of the bank and low-water mark, and the 8 Dana case, supra, was a litigation between the Kennedy heirs and the city of Covington as to certain proprietory rights in and to that ground. On the point here involved the court in that case, the opinion in which was written by Judge Robertson, said: "We have no doubt that Covington, as established by the legislative act of February, 1815, extends to the Ohio river, as its northern line of prescribed limits." That declaration was repeated a number of times in the opinion, and was reiterated by this court in the case of Kennedy v. City of Covington, 17 B. Mon. 567.

In the opinion in the latter case reference was made to the 8 Dana case, and what it decided, and in which this court, speaking by Judge Simpson, said: "It was also decided (in the 8 Dana case) that the city of Covington extended to the Ohio river, and that the title of the strip of land next to the river, was held in trust, not only for the use of the city, but also for the use of the owners of the ferry franchise." The owners and lessees of one of the bridges sought to be assessed are the successors in title to the ferry privileges involved in the 8 Dana case, and the opinion in that case adjudging the Ohio river to be the northern boundary of the city of Covington is at least binding on them, and it is also a precedent to guide us in the determination of the same question in the other case, in which the owners of the bridge sought to be taxed by the city did not derive title through the Kennedy heirs, whose ferry privileges were reserved in the Kennedy deed to Gano and the other two trustees.

But it is not strenuously insisted by learned counsel for the bridge companies that the doctrine of extend-

ing the boundary of an individual grantee, by presumption or construction, to the center or thread of the physical boundary line called for in the muniments of title (and which we have found would apply in this case to the grantee in the inter partes deed executed by Welch to Kennedy), does not apply to similar boundaries of municipal corporations, and in support of that contention a number of the early opinions from this court are cited, among which are the 8 Dana and the 17 B. Mon. cases, supra, and the case of City of Louisville v. Bank of United States, 3 B. Mon. 138. It is contended by counsel that this court in those three cases, and the other cited ones, confined the boundaries of the municipality involved in each of them (all of which were located on the Ohio river) to low-water mark on the south boundary of that stream, and which, it is contended, prevented the northern line of such municipalities from being extended under the rule supra, to the thread of the river. We do not so construe the opinions relied on by learned counsel to sustain that contention. In all of them the question of riparian ownership and rights in and to the *bank* of the Ohio river between its low-water mark and the top of the bank was the only one involved, and in each of them it was determined that the corporate limits of the respective municipalities involved extended far enough to give such municipality the rights contended for by them.

The question in the 3 B. Mon. case revolved around the proper construction of a certain patent to one Connelly. It was held therein that "Connelly certainly owned the ground to low-water mark, and the town of Louisville, as originally laid out and established, was in our opinion as certainly bounded by the same line," i. e., by the river. In the two Kennedy cases (8 Dana and 17 B. Mon.) only certain rights of the city of Covington in and to the south bank of the Ohio river between its low-water mark and the top of the bank were involved. The court, as we have seen, held that such rights extended to the low-water mark on the south shore of that stream, and that the river was the north boundary of the corporate limits of the city of Covington.

To have attempted to decide anything else (including the question as to whether the river boundary involved in each case extended farther into the river than low-water mark) would have been dictum, pure and simple. However, no such dictum is found in any of those opinions, and the court in each of them contented

itself with the decision of the questions involved, i. e., whether the particular municipal boundary extended far enough to include the disputed land. So that we do not regard the opinions relied on as establishing the contention of counsel that the general rule supra, of extending the boundary of a private owner to the center of a described physical line, does not apply to municipal corporations having similar boundaries; and which brings us to a consideration of the question of whether the rule is applicable to municipal boundaries as well as to private owners and which specific question, so far as we are able to discover, has never been expressly determined by this court. But it was inferentially so held in the case of Commonwealth v. Stahr, 162 Ky. 388, 172 S. W. 677, wherein the true location of the southern boundary of the city of Fulton, Ky., through which runs the line between the states of Kentucky and Tennessee, was involved, and wherein this court announced principles indicating that the boundaries of municipalities by physical lines would be governed by the same rule as such boundaries contained in discriptions of conveyances to private owners.

Our investigation has demonstrated that in all jurisdictions where the rule of construction or presumption supra applies to boundaries of private owners, it likewise applies to the same extent to such boundaries of municipal corporations. It is so stated in the text in 19 R. C. L. 699, sec. 10; 28 Cyc. 181; McQuillin on Municipal Corporations (2d Ed.) vol. 1, sec. 262, vol. 1, sec. 263 (1st Ed.), and Dillon on Municipal Corporations, volume 1 (4th Ed.) sec. 182.

The cited volume of R. C. L. on this point says: "When a municipal corporation is bounded by a tidal navigable watercourse, its territorial limits extend only to the low water mark and when it is bounded by a fresh water unnavigable watercourse, its territorial limits extend to the middle of the stream. On this point the authorities are uniform. In the case of a navigable but nontidal water-course there is a conflict of authority. In some states it is held that the private title of a riparian owner extends to the center of all nontidal watercourses, whether navigable or not, and in such states it is held that municipal boundaries also extend to the center of the stream, but in a state in which the title of a riparian proprietor upon navigable watercourses extends only to low water mark, if one of the boundaries of a municipal

corporation, as designated by statute, is a navigable stream, such boundary does not extend beyond low water mark.''

The text in the cited volume of Corpus Juris, on the same point, says: ''Ordinarily the same rules of construction as govern the description in a grant or conveyance to an individual are applicable in determining the territorial limits of a municipality bounded by a river or body of water''; while Mr. McQuillin in the text of his work referred to says: ''The rules of construction as to boundaries of municipal corporations bordering on navigable water are the same as are applicable to a description in a grant of land so situated to an individual.''

We have been unable to find any authority to the contrary; but the rule as applicable to municipal corporations is subject to the same exceptions and qualifications as prevail with reference to its application to private ownership of lands so bounded, i. e., that, if the instrument in which the boundary is found (charter as to municipalities) clearly indicates that it was the intention of those who executed or enacted it that the boundary should stop short of the center or thread of the stream and be fixed at some specific line (such as low-water mark), then such specific intention would prevail and the rule would not apply.

The Welch deed, and the special acts of the Legislature fixing the north boundary of the city of Covington as now inclosed, contains no language indicating an intention to limit the application of the rule so as to locate the boundary of that city differently from where the constructive or presumptive rule under consideration would fix it (the center or thread of the Ohio river), and, that being true, the conclusion is inevitable that the northern boundary line of the city of Covington extends, at least, to the thread of that river, unless some other sufficient fact appears in the case to prevent such interpretation; and which brings us to a consideration of two of such urged facts—(a) immemorial usage and custom, and (b) alleged contemporaneous construction by the Kentucky Legislature and the municipal authorities of the city of Covington.

In announcing the general rule supra, as it applies to an individual owner with a stream or street or road as one of his boundaries, this court said in the Snyder case, supra, that to prevent the application of the rule in such cases ''it would require an express exception in the

grant, or some clear and unequivocal declaration, or certain and immemorial usage, to limit the title of the (private) owner, in such cases, to the edge of the river.'' Under contention (a) it is insisted that, since the beginning of the existence of the town of Covington, its municipal authorities, as well as the Legislature, by various special acts (too numerous to catalogue in this opinion) recognized the northern boundary of the city as being located at low-water mark on the Kentucky shore of the Ohio river, and that under the exception announced in the Snyder opinion the rule contended for by appellant should not apply in these cases. In the first place, it is extremely doubtful if the evidence sustains the relied on immemorial usage and custom; but, waiving that point and conceding that the evidence does sustain it, we are then confronted with the question as to what character of immemorial usage and custom, as referred to in the Snyder opinion, would have that effect. There can be no difference between such alleged usage and custom arising and prevailing after the creation of the instrument to be construed, and ''contemporaneous construction'' to be hereinafter discussed, and it is our conclusion that the ''usage and custom'' referred to in the Snyder opinion as limiting the application of the rule was such a usage and custom as prevailed within the jurisdiction wherein the instrument to be construed was executed at the time of its execution.

To illustrate, if there was a prevailing usage and custom at the dates of the instrument here involved to the effect that a described boundary on a nontidal water course as being at low-water mark, and not extending beyond that line, it would have the same effect as a local law upon the subject, and would prevail against a presumption or construction extending the line to the thread of the stream. The prevailing rule in this jurisdiction as to the effect of contemporaneous construction (see post) fortifies our conclusion as to the character of usage and custom required to create the exception referred to in the Snyder case. So that, fact (a) urged by learned counsel for the bridge companies as taking this case out of the general rule supra, cannot be sustained.

It is next insisted under fact (b), that the Legislature and the municipal authorities of Covington, through various enactments of statutes and ordinances, construed the instruments designating the northern boundary of the city of Covington as extending it to only low-water

mark on the south shore of the Ohio river. Again, we repeat, that it is extremely doubtful if the evidence supports this contention, especially as to the alleged construction by the city authorities. But, be that as it may, it is the universal rule that contemporaneous construction is never invoked by the courts, *except* and *only* where the thing to be construed is ambiguous and doubtful in its meaning. 36 Cyc. 1139; 12 R. C. L. 315; United States v. Graham, 110 U. S. 219, 3 S. Ct. 582, 28 L. Ed. 126; Board of Trustees, etc., v. Outagamie County, 150 Wis. 244, 136 N. W. 619, 2 A. L. R. 465; Barker v. Crum, 177 Ky. 637, 198 S. W. 211, L. R. A. 1918F, 673; Citizens' Telephone Co. v. City of Newport, 188 Ky. 629, 224 S. W. 187, 14 A. L. R. 1369; State Text-Book Commission v. Weathers, 184 Ky. 748, 213 S. W. 217; Sewell & Arlington v. Bennett and Levi, 187 Ky. 626, 220 S. W. 517; Shelby v. Shelby, 192 Ky. 304, 233 S. W. 726; Houghton v. Payne, 194 U. S. 88, 24 S. Ct. 590, 48 L. Ed. 888, and numerous cases referred to in those opinions.

As we have hereinbefore seen, the language to be construed in this case (the descriptions contained in the instruments and statutes designating the northern boundary of the city of Covington) is not ambiguous. On the contrary, it explicitly and plainly makes the Ohio river the northern boundary of the city of Covington, and if in such case (as we have seen it does) the law through the operation of the constructive and presumptive rule supra, extends that line to the thread of the stream, it would not be competent for it to be altered by the alleged contemporaneous construction relied on in fact (b) to accomplish that end. But, over and beyond that, this court, in the case of Baltimore & Ohio Southwestern Railroad Co. v. Commonwealth, 177 Ky. 566, 198 S. W. 35, 46, held that: "Mere nonaction upon the part of the officers of the state (or municipalities) is not to be treated as contemporaneous construction," citing the case of Commonwealth of Ky. v. Kentucky Distilleries & Warehouse Co., 143 Ky. 314, 136 S. W. 1032.

In the 177 Kentucky case referred to, the question of the right to tax the property of the railroad company was involved, and one of the defenses was that the proper taxing authority had for a number of years declined to assess the property or levy the tax, upon the ground that it construed the statute as exempting it from taxation, and the court held that the property was plainly subject

to the tax sought to be recovered, and that such nonaction on the part of the assessing officers could not be dignified as contemporaneous construction so as to exempt the property from the burden sought to be imposed upon it. There are many cases in this jurisdiction to the effect that *acquiescence,* or "contemporaneous construction," whereby an alleged municipal corporate line was recognized by the municipal authorities, contrary to the plainly designated boundary in the charter, would not prevail over such plainly designated boundary line, and for the all sufficient reason that the acquiescing municipal authorities, so construing the boundary of the municipality, had no power or authority to so alter or change the plainly designated boundary of the charter incorporating the municipality.

But it is insisted that this court held otherwise in the case of Belknap v. City of Louisville, 93 Ky. 444, 20 S. W. 309, 14 Ky. Law Rep. 420. A reference to that opinion will show that the description of the disputed boundary was *extremely* ambiguous and uncertain, and that everyone concerned construed it and acquiesced in that construction, and the court adopted it, but only because of such ambiguity and uncertainty. So that the Belknap case is not contrary to all others limiting the contemporaneous construction rule to cases and instances where the language to be construed is doubtful and ambiguous. It is therefore our conclusion that the northern boundary of the city of Covington extends as far as the center or thread of the Ohio river, which stream is the northern boundary of the city.

But it is strenuously insisted by learned counsel for the city that, inasmuch as the northern boundary of the commonwealth of Kentucky is low-water mark on the northern shore of the Ohio river, the northern municipal boundary of the city of Covington should extend to that line, and in support of that contention the domestic case of Commonwealth v. Louisville & Evansville Packet Co., 117 Ky. 936, 80 S. W. 154, 25 Ky. Law Rep. 2098, and perhaps some other similar ones, are relied on. The question involved in that case was the northern limits of a magisterial district in Breckinridge county; and, although such district was described as bounded by the Ohio river, it was held that its north boundary under the rule herein discussed extended to the county and state line, i. e., low-water mark on the northern shore of that

river, and which was done *exclusively* because of the fact that all of the territory in each county of the commonwealth is required by the Constitution of this commonwealth to be included in some one of the magisterial districts in the county.

No such requirement exists as to municipal boundaries; and in the Stahr case, supra, it was in effect held that no such rule of interpretation would be applied in cases of municipal boundaries. In that case, as hereinbefore stated, the question involved was the true location of the south boundary of the city of Fulton, Ky. There was and is a street along the southern boundary of that city known as "State Line Street," and within which, or at the south side of which, is the line between the states of Kentucky and Tennessee. It was held therein that the true location of the southern corporate limits of the city of Fulton were to be determined by the language describing that line, and not to be determined by the true location of the state line; and which we construe as an adopted interpretative rule contrary to the one contended for by learned counsel for appellant. But, without the persuasive effect of that case we see no logical reason for the adoption of the rule contended for by counsel, and we do not construe the case relied on by him (Louisville & Evansville Packet Company case) as bearing upon, much less settling, the question.

But counsel furthermore insists that the rule for which he contends was adopted and applied by the Pennsylvania Supreme Court in the case of Neal v. Commonwealth, 17 Serg. & R. 67, and which he insists should be followed in this case. With all the available lights before us, we must acknowledge our inability to grasp the facts that led the court in that case to the conclusion announced. There may have been some fact that controlled it in doing so not found in this case. But, be that as it may, the Stahr opinion, supra, as we interpret it, adopted, by strong inference at least, a different rule, and, in the absence of the plainly expressed reasons therefor, contained in statutes, charters, or controlling documents, the rule so anounced in the Pennsylvania case is without support in logic, or reason, and it is in direct conflict with the unbroken list of text authorities supra, saying that, wherever the boundary of an abutting private owner on a stream is by construction or presumption extended to the thread of the stream, then the same

rule will apply as to locating the boundaries of municipalities. We have hereinbefore seen that this court in the case of Ware v. Hager, supra, and others following it, determined and held that a private owner whose boundary was the Ohio river would not acquire title under the rule coextensive with the state line, but only to the center or thread of that river, and under the text authorities, supra, we would not be authorized to extend by presumption the boundary of a municipality located on that stream any farther than would be done in the case of an individual riparian owner. We must therefore decline to adopt the principles announced in the Pennsylvania case.

Other collateral questions are discussed in briefs of counsel which, perhaps, have a remote bearing upon the controlling question involved in this case, but none of them is deemed sufficient to affect the conclusions hereinbefore announced, and for that reason, and because of the already extreme length of this opinion, we will refrain from discussing them.

Lastly, it is insisted by learned counsel for the bridge company, involved in case 33019, that the question as to the location of the northern corporate boundary of the city of Covington, as between it and the city, was adjudicated and fixed by the judgment in the case of City of Covington by its Delinquent Tax Collector v. the Covington & Cincinnati Elevated Railroad and Transfer Bridge Co. (hereinbefore referred to), as being at low-water mark on the south shore of the Ohio river, and for that reason its plea of res adjudicata should prevail. The action in which the judgment so relied on was rendered was filed in the Kenton circuit court by the delinquent tax collector for the city of Covington in 1914. It sought an enforced assessment of the same bridge involved in the instant case (33019), and a judgment against its owners in favor of the city for the amount of the taxes based upon such enforced assessments, for the years involved, upon the physical property of the bridge and the value of its franchise. That case lingered on the docket until 1927, when the court sustained both a special and general demurrer filed to the petition, the one being sustained upon the ground that the court had no jurisdiction of such an action, and the other, as we conclude, upon the ground that the petition was insufficient to sustain the alleged cause of action, and the petition and amendments thereto were dismissed.

Something like a year after that these instant actions were filed in the Franklin circuit court, and after which, and after the Kenton circuit court had completely lost jurisdiction of that case, the parties appeared in that court, and by consent filed what is styled a "Substituted Petition," and at the same time they withdrew all former pleadings in the cause, and asked for and obtained an order setting aside the first judgment theretofore rendered therein. The substituted petition purported to have been filed under our declaratory judgments statute, and submitted to the court solely the concrete question as to the true location of the northern boundary of the city of Covington. If the ultimate purpose of the substituted petition, filed as we have seen, after the institution of these two actions in the Franklin circuit court, was intended by the parties to govern the right of the city to collect taxes from the bridge company on that portion of its bridge or any part thereof spanning the Ohio river between low-water mark on its respective shores, then the court would not have jurisdiction to entertain it, because the delinquent tax collector had no right to bring it, to say nothing about the further question of the right to set aside a judgment of which the court had lost jurisdiction, and then file a substituted pleading in which an entirely different action was set up, and wholly different relief was asked.

The court dismissed the substituted petition, and it is insisted that such judgment was an adjudication fixing the northern boundary line of the city of Covington at low-water mark on the Kentucky shore. But, if we should concede that such was the effect of the judgment, then the questions of its validity and the jurisdiction of the court to render it would still confront us. The attorneys for the delinquent municipal tax collector for the city of Covington, through and by whom all such proceedings were had, prosecuted an appeal to this court. Later employed substituted counsel for the city moved this court to dismiss that appeal because the judgment appealed from was, among other things, void. Counsel for the bridge company resisted that motion, but this court sustained it, and dismissed the appeal, thereby sustaining the grounds upon which the motion was made, which was the invalidity of the judgment. Thus far we have considered this defense upon the theory that the alleged and relied on res adjudicata judgment actually determined and fixed the location of the northern corpor-

ate boundary of the city of Covington as now contended for by the bridge company. But, in truth and in fact it adjudged nothing, except that the plaintiff could not maintain the action. The substituted petition and following pleadings sought a judgment by the court fixing such northern municipal boundary line as the parties now contend in the instant cases, i. e., by defendants that such line was at low-water mark on the Kentucky shore of the Ohio river, and by plaintiff that it was located either at the thread of that stream, or at low-water mark on its north shore. The judgment rendered decided neither the one way nor the other, and left the question entirely open. We are therefore thoroughly convinced that the relied on judgment, for the reasons stated, does not support the res adjudicata plea, and that defense must be disallowed by us.

Summarizing, and briefly stating our conclusions, they are: (1) That the northern boundary of the city of Covington under the descriptions found in the controlling instruments bearing upon that question is the Ohio river, and that there is nothing contained in such descriptions limiting such boundary to low-water mark on the south shore of that stream; (2) that in such case the law construes the boundary as extending to the center or thread of the stream, and which rule applies to a municipal boundary on such streams the same as to boundaries of a riparian owner on a water course; (3) that, there being no ambiguity in such descriptions, neither subsequent usage or custom, or contemporaneous construction, can alter or change the boundary from the center or thread of the stream; and (4) that the municipal boundary in this case does not extend across the Ohio river to coincide with the state boundary which is located at low-water mark on its northern shore.

It results, therefore, that the court erred in not adjudging plaintiff the relief it sought to the extent of requiring the state tax commission to certify to it for the years involved, the physical and franchise valuations of that portion of the involved bridges between low-water mark on the Kentucky shore and the center or thread of the stream. For that reason the judgment in each case is reversed, with directions to set it aside and to enter one in conformity with the principles of this opinion.

Whole court sitting.